# CHARLESTON.

## MILLER v. WHITE.

## (CARNEY Intervener).

Submitted September 20, 1898—Decided March 22, 1899.

46    67
47   437

46   67
51  254
51  515

46   67
55  398

46   67
56  529

1. ATTACHMENT—*Affidavit—Lien.*

    There may be in the same suit more than one affidavit and attachment, based on different grounds. The lien of such other attachment does not relate back to the first. (p. 70).

2. JUDGMENT—*Evidence.*

    It is an axiom of law "that, when a judgment of a court is offered in evidence collaterally in another suit, its validity cannot be questioned for errors which do not affect the jurisdiction of the court which rendered it." *Cooper* v. *Reynolds*, 10 Wall. 308. (p 71).

3. ATTACHMENT—*Affidavit—Jurisdiction.*

    Where there is no service of process or appearance, and the seizure of property of defendant is the foundation of jurisdiction, defective or irregular affidavits for attachment, though they might reverse a judgment in the case for error in departing from the statute, do not make the suit one without jurisdiction, if the court have jurisdiction in cases of that class. A total want of affidavit for attachment in such case would show there was no jurisdiction, but a mere insufficient averment in the affidavit would not. *Cooper* v. *Reynolds*, 10 Wall. 309. (p. 71).

4. ATTACHMENT—*Record—Affidavit.*

    Where the validity of an attachment is involved, or the jurisdiction questioned, the affidavit and order of attachment are parts of the record, though not mentioned in declaration or bill. (p. 71).

5 ATTACHMENT—*Intervener—Pleading.*

    Under Code 1891, c. 106, s. 23, any one having claim to, or an interest in, or lien on property attached by other attachment or otherwise (but not a general creditor), may by petition intervene in the case, and contest the validity of the attachment in any lawful mode, and may file a plea in abatement, denying the grounds of attachment, In such case the plaintiff has the correlative right of denying the validity of, or otherwise contesting, the intervener's attachment or other claim. (p. 71-2).

6. VERDICT—*Evidence—Issue*.

Where two matters are submitted to a jury, one of them improperly submitted, and evidence is given pertinent alone to that improperly submitted, such improper submission to the jury, and the evidence thereon, will not affect the verdict on the matter properly before the jury, where the matters are distinct, and it appears that such improper submission and evidence did not confuse the jury, or operate to the prejudice of the party upon the issue properly before the jury. (p. 72).

7. HARMLESS ERROR—*Judgment*.

Where it is proper that the court, and not the jury, should pass on a matter and find thereon, but a jury finds upon it and the court renders judgment, if the judgment is the same as the court should have rendered if it had expressly found on such matter, this error is harmless, and not cause for reversal. (p. 73).

8. ATTACHMENT—*Fraud—Sale*.

If one buys property on credit, with positive intention not to pay for it, whether he makes false representations as to his ability to pay or not, it is a fraud upon the vendor, and is a fraudulent contraction of a debt, giving ground of attachment. (p 73).

9. ATTACHMENT—*Fraud—Insolvency—Sale*.

Mere insolvency or inability to pay for property purchased will not render the sale fraudulent on the purchaser's part, if he expects and intends to pay, and has reasonable ground for expecting to be able to pay. If, in addition to insolvency, he makes false statements of his pecuniary circumstances or business, or his ability to pay, calculated to induce the seller to believe he will be paid, the purchase is fraudulent, and ground for attachment. (p. 74).

10. INTENTION NOT TO PAY—*Sale—Jury*.

An intention of a purchaser of property not to pay for it may be inferred by a jury, from his circumstances, action, and conduct, not only in respect to the sale in question, but in other cotemporaneous transactions. (p. 74).

11. VERDICT—*Error*.

A verdict plainly and decidedly contrary to the decided preponderance of the evidence, or contrary to the law upon admitted, or indubitably established facts, under the evidence, should be set aside. (p. 76).

Error to Circuit Court, Mason County.

Action by D. M. Miller against Luther White. One Carney intervened, and issued a second attachment. From a judgment giving preference to the attachment of Carney, Miller brings error.

*Reversed.*

V. B. ARCHER and W. N. MILLER, for plaintiff in error.
JOHN E. BELLER, C. E. HOGG and W. R. GUNN, for defendant in error.

BRANNON, JUDGE:

This is a contest between two creditors of a common debtor under attachments on the same property. Miller brought *assumpsit* in the circuit court of Mason County againts White, and levied an attachment upon certain personal property; and later Carney brought a chancery suit in same court against White, and levied an attachment on the same property, and some days later filed another affidavit, and sued out and levied on the property another attachment, and then field a petition in the Miller action, under Code 1891, c. 106, s. 23, disputing the validity of Miller's attachment, and setting up his own second attachment as a superior claim to Miller's attachment; and he filed a plea in abatement, denying the ground stated by Miller in his affidavit for attachment, namely, that White fraudulently contracted the debt on which Miller's attachment was based. The property was sold, under order of the court, as perishable, and the fund awaits decision of this litigation. A jury tried the case, and found that Carney's second attachment lien was superior to Miller's attachment lien, and that the grounds stated in Miller's affidavit for his attachment did not exist, and the court gave judgment of preference for Carney, and Miller appeals by writ of error.

Miller claims that Carney's attachment is invalid, and does not affect his attachment. Carney's first affidavit is bad. It is not relied on by counsel, nor is the attachment under it. Carney's second affidavit is attacked because it does not state who is the payee of a draft and negotiable notes given by White, and does not say that plaintiff is entitled to them as holder. It gives dates, amounts and maturity of the draft and notes, and says that White made them. It does not say to whom executed, but it states that they were given for logs sold by Carney to White, and this justifies the conclusion that Carney was payee in the draft and notes, and owned them; and this denies the application to this case of *Sommers* v. *Allen*, 44 W. Va. 120, (28 S.

E. 787). I hardly think the omission to state the bank of payment would defeat the affidavit.

It is contended that there can be no second attachment in the same suit. The Code allows several orders of attachment, to go to different officers, to be issued at the same or different times, but I understand this to mean several orders of attachment on one affidavit for the same ground or grounds of attachment; and so this clause does not justify a second affidavit on a different ground of attachment, and a second attachment on that ground. Nor does that clause of the statute allowing an amended affidavit to show additional facts to sustain a ground of attachment before stated in an affidavit. But the Code says that "the plaintiff, at the commencement of the action or suit, or at any time thereafter before judgment, may have an order of attachment" on filing an affidavit stating that "some one or more of the following grounds exist for such attachment" (naming eight grounds). Now, assume a suit properly in court, and an attachment on one ground, and the plaintiff later discovers another ground. Why shall he not sue out a second attachment upon a second affidavit, stating the second ground of attachment? In this case Carney alleged grounds of attachment other than that of non-residence in his first affidavit, and seeing that it was bad, and discovering that White was, or had since become, a non-resident, why not say that the Code intends to allow him the benefit of non-residence for attachment? See _Crim_ v. _Harmon_, 38 W. Va. 603, (18 S. E. 753). Such second attachment does not, for lien, relate back to the first, but is a lien only from its levy as to personalty, or its date as to land.

Another question: I have no idea that, if there is no jurisdiction for the suit at its start, a second attachment can impart jurisdiction. Jurisdiction, at the start of Carney's suit, rested on the charge that White had absconded and concealed himself from process, and that the debt was fraudulently contracted; and, it being a suit in equity on a legal demand, jurisdiction rested solely on the attachment; and, as the first affidavit was bad, the question arises whether there was jurisdiction,—that is, whether the bad affidavit gave the court jurisdiction, so as to warrant a second attachment. For such a question we must distinguish

between void and voidable. The first affidavit, though defective, was only voidable or quashable, not a total nullity; and the attachment gave jurisdiction, notwithstanding the defect in the affidavit. Van Fleet, Coll. Attack, § 257; *Cooper* v. *Reynolds*, 10 Wall. 308. Mere error in proceedings does not destroy jurisdiction, if the court has jurisdiction in cases of that class. Drake, Attachm. § 89. Attachment proceedings are not void because an affidavit fails to say that the claim is "just." *Ludlow* v. *Ramsey*, 11 Wall. 581. That is the defect in the first affidavit in Carney's Case. A total absence of affidavit would render the suit one without jurisdiction, but a mere insufficient averment in an affidavit would not make the proceeding void, as one without jurisdiction. 1 Shinn, Atachm. §§ 152, 411, note 3; Drake, Attachm. § 87a. It is said that the second attachment is without affidavit to support it, unless it be the first or bad one, as the second affidavit is a fugitive paper, not part of the record, because neither it nor its attachment is mentioned in the bill. The affidavit bears the title of the suit, and expressly says that Carney had brought the suit, and that it was then pending. It is a part of the record, though not mentioned in the bill. An attachment is an ancillary proceeding, but is a part of the record; and this one refers to an affidavit, and it and the affidavit bear the same date, and we must connect them. Wherever the validity of an attachment is involved, or the jurisdicion questioned, the affidavit is part of the record. *Id.* § 90. It is clear that as Carney set up a lien against the property by his atachment, though a stranger to the suit, he not only had a right to contest the validity of Miller's attachment, but also, by plea in abatement, to deny the ground on which it stood, and to disprove the facts to show such ground, as the Code allows any person to intervene and dispute the validity of an attachment, or state a claim to, interest in, or lien on the property, under any other attachment or otherwise; in other words, to challenge the validity of the attachment, just as the defendant might do. *Ludington* v. *Hull*, 4 W. V a. 130; *Capeheart's Ex'r* v. *Dowery*, 10. W.Va. 130. Therefore it was no error to allow the plea in abatement. *Stevens* v. *Brown*, 20 W.Va. 450. The party thus intervening must be, not a general

creditor by note or other demand, without lien, but must be one who has a claim to, an interest in, or lien on the property by other attachment or otherwise. So reads the statute. 1 Shinn, Attachm. §§ 411, 427; *Crim* v. *Harmon*, 38 W. Va. 596, (18 S. E. 753). Of course, as this stranger is allowed to intervene and make defense to the attachment, the correlative right is given the plaintiff to contest this stranger's right by showing invalidity of his attachment, for patent defect or want of ground of attachment. That would be only a right of defense, when attacked.

Another question: It was proper for the court to pass on the legal effect of Carney's attachment papers, to determine whether Carney had a valid lien; but had the jury anything to do with them? Carney asked to contest the validity of Miller's attachment, and he made a motion to quash it, which was overruled, and then filed a plea in abatement to Miller's attachment, denying the right of attachment, to which Miller replied generally, and issue was joined under that plea. No other issue of fact was in the case. The jury was sworn to try "the issues joined, and inquire into the petitioner's claim," and rendered a verdict that Carney, by his second attachment, had a lien prior to Miller, and that the grounds of attachment stated in Miller's affidavit did not exist. This feature of the case presents perplexing questions. There was nothing proper to go to the jury but the issue on the plea of abatement. The jury, however, was sworn to inquire into Carney's claim. It is true, the Code does say that a jury shall inquire into the claim of the party claiming right over the plaintiff; but that means where an issue of fact is developed, and does not mean that where, as in this case, the contestant's claim is based on the legal effect of documents, a jury is to pass on that. Therefore it was wrong to swear the jury to try anything but the issue on the plea in abatement, and wrong to put before it the attachment and affidavit, and especially the bad affidavit and attachment. Of this I feel sure. But I do not feel so sure of the effect of this error. Does it prejudice, or is it harmless? I conclude that swearing the jury to pass on Carney's claim is simply surplusage, so to call it, immaterial; and so with the introduction as evidence of the attach-

ment papers. It may be said that this improper inquiry and evidence may have injured Miller by tending to confuse the jury as to the true issue under the plea in abatement, but I hardly think so. Improper evidence, if it might have injured the party, will reverse a verdict; but as the issue under the plea, and the further inquiry as to Carney's claim, were distinct and separate, I do not see that such evidence could have reasonably influenced the jury as to the matter before it on the plea.

From what I have said, it follows that the court, not the jury, should have found for or against Carney's lien. The court has not done so, except inferentially, by rendering judgment on the verdict. Is this reversible error? I think not. We find, on the papers, Carney's lien good; and the circuit court, having, by overruling the motion for a new trial and rendering judgment, done what it should have done, had it properly passed on Carney's lien, we conclude that this omission to find as to Carney's lien is not reversible error.

Contention is made that Miller cannot question the effect of Carney's attachment documents, as he did not incorporate them in a bill of exceptions; but their legal effect would arise on a motion for new trial.

Miller excepts because he was refused an instruction that every person is presumed to anticipate and intend the probable consequences of known causes and conditions; hence, if White, who purchased logs of Miller, was insolvent (that is, did not have money to make good his promises of payments), and White knew of his insolvency and inability to pay, then his intention not to pay should be presumed; and if, when he purchased logs from Miller, he had no means by which he could meet the cash and other payments which he proposed and agreed to make, he was guilty of perpetrating fraud on Miller, and thereby fraudulently contracted the debt, and the jury should find for Miller. This involved the law question of what is a fraudulent contraction of debt under our statute making that a ground of attachment. This question is touched, but not decided, in *Wickham* v. *Martin*, 13 Gratt. 436. The law is that, where one buys property with intention not to pay for it, it is a fraudulent purchase, whether he make false

representations or not. A purchaser's mere knowledge that he is insolvent, and that his ability to pay is, to say the least, doubtful, will not, alone, unattended with a positive intent not to pay, make the purchase fraudulent. True, the difference between buying without reasonable expectation or ground for expectation of paying, and buying with fixed intention of not paying, is not very plain. One who buys, with no present means, and with no reasonable ground to believe that he can raise a considerable sum to pay with, seems to contemplate, as a reasonable man, that he will not be able to pay. He would expect that, as a natural result. Still, there must be an intention not to pay, and whether there is a jury must say, under all the circumstances. Such intent "may be inferred by the jury from the circumstances and conduct of the vendee, not only in respect to the sale in question, but in other contemporaneous transactions." *Henneqdin* v. *Naylor*, 24 N. Y. 139; 21 Am. & Eng. Enc. Law, 50; Benj. Sales, 442. *Talcott* v. *Henderson*, 31 Ohio St. 162, holds that: "A contract for the purchase of goods on credit, with intent on the part of the purchaser not to pay for them, is fraudulent; and if he has no reasonable expectation of being able to pay, it is equivalent to an intention not to pay. But where he intends to pay, and has reasonable expectation of being able to do so, the contract is not fraudulent, although the purchaser knows himself to be insolvent, and does not disclose it to the vendor, who is ignorant of the fact." If, in addition to insolvency, the purchaser makes misstatements of his ability to pay, or means of payment, there is fraud. "Here the rule is this: If he fraudulently misstates the facts,—material facts,—the sale is voidable. False statements as to what property he owns, what debts he owes, what amount of business he is doing, that his property is unincumbered, etc., come within this class." Benj. Sales, 441. "One who, knowing the insolvent character of his business, makes a statement that he is solvent, and does this to obtain credit, fraudulently contracts a debt, within the meaning of the statute. But the bare fact of insolvency at the time a debt was contracted, does not make it fraudulent. It must be incurred with intent to defraud the creditor." 1 Shinn, Attachm.

§ 125.   Tried by these principles, I do not think it was error to reject that instruction, as it told the jury that mere insolvency and inability to pay, known to White, would raise a presumption of an intent not to pay, and infallibly make the contract fraudulent on his part.

The last question is whether the verdict, finding that the purchase was not fraudulent on White's part, is to stand.   White came to Mason County from Indiana, where he resided, in June, 1896, stayed over night at a hotel, and could not pay his bill of seventy-five cents.   He himself says that when he arrived he "may not have had a dollar."   That month he purchased a mill at five thousand two hundred dollars, agreeing to pay one thousand dollars down, the balance later; but, though put in possession, he paid nothing.   He expected money from parties, as he says, but was disappointed.   That month he borrowed little amounts from Kisar.   After he purchased the timber, he bid on building a boat for five thousand six hunrerd dollars, on which there would be a loss of eight hundred dollars; and yet this is a source from which he hoped to pay for the timber.   He boarded with Mrs. Loomis, paying only a part of the board, and left the State in July in debt to her for board, and to her husband for work.   He told this lady that he had money in a safe in Indiana, and had written to his daughter to send it, but she could not open the safe, and he would write to her to break it and send the money.   The money did not appear.   In June he offered to buy of Miller fifteen thousand dollars worth of timber, without a dollar to pay for it, and did buy a lot of timber, coming to three thousand seven hundred and thirteen dollars and forty-three cents, and agreed to pay one thousand dollars cash, balance in thirty and sixty days, but paid nothing.   He promised to send Miller a check for one thousand dollars, but failed.   Oral evidence and his letters show this.   He then wrote Miller to draw a sight draft for it, which he did, but it was not paid.   He then wanted Miller to take a time note for it.   He had no money in bank at Point Pleasant, where he carried on milling, or elsewhere, to pay a check or draft.   When negotiating with Miller, he told Miller that he had one thousand dollars to pay cash, but wanted time for the balance.   He

admitted as a witness that he did not have one thousand dollars, or any money, but expected to get money. He represented to Miller that he had carried on extensive milling in Indiana, had sold out, and would get money from there. He promised Miller cash, then a check, then to pay a draft, and then sought to get further time; and we may fairly say that this "putting off" was to get possession of the timber, as he did, it being sent to him from Parkersburg. White's letter requesting Miller to accept his note at thirty days and take up the draft is irrefutable evidence that he had no money, as many other circumstances show. In fact, he so admitted on the witness stand. In a letter he said he expected to get money from building a boat, which he never built, and again he says he expected money from a sale of the timber. If he had told Miller that he had no money, but mere expectation of it, would Miller have sold the timber to him? He suppressed his insolvency and asserted solvency. To induce Miller to sell, he told him that he had bought timber of Carney. So he had, to the amount of one thousand nine hundred and five dollars, and gave Carney an accepted draft, June 24th for down payment, six hundred and thirty-five dollars, and two time notes, and never paid a cent. Carney's affidavit charged White with fraud in that purchase from him, and with false representation that he had money due him from some one in Indiana, and would get it in a few days. This purchase was shortly before that of Miller. The same circumstances give hue to both. I am at a loss to see how Carney can say that White fraudulently contraced the debt to him, and turn around and say that no fraud exists in the Miller transaction. Miller swore to these statements and representations of White, and White, though on the stand afterwards, did not deny Miller's evidence. White's own evidence shows that he had no means, but a mere hope of getting money, with no basis shown on which to found that hope,—a mere hope to sell the timber. That he made the statement that he had money to pay the down one thousand dollars is sworn to by Miller, not contradicted, and is verified by the fact that he agreed to pay the cash, and then promised a check, which a letter to Miller shows, and then authorized a sight

draft. This alone is a representation of having the money. This shows that he held out to Miller that he had money to pay the one thousand dollars, even if Miller's evidence, uncontradicted, were not in the case. He admits he did not tell Miller that he merely relied on some deal to get the money. He expected to sell the timber. He admits he had no money in bank to pay check or draft. And I see just now that he admits that he told Miller he had sold property in Indiana, from which he expected to get money to pay him; and he admits that this was untrue, as he says his son-in-law owned a farm, and he expected him to sell, and come to this State to live. He had no interest in the farm, further than he had lent his daughter seventy-five dollars or one hundred dollars. He admits he had only one hundred and twenty dollars in that safe in Indiana. Did he have that? It never appeared. Here we find a man, coming to this State, making large purchases of mills and timber within a few weeks, amounting to ten thousand dollars, agreeing to pay cash part payment, paying not a cent, purchasing on false statement of having means to pay, ready money to pay the cash installments, and yet without property or money,—utterly so; so poor that he had to borrow money from others to pay his day laborers, and money to go the short trip to Parkersburg to buy Miller's timber, and without money to pay hotel or board bill. These facts are admitted by White on the stand as a witness, and proven clearly by uncontradicted testimony. Slow as I am to overthrow verdicts, I must say that this verdict is utterly indefensible, because plainly, palpably contrary to the very great preponderance of the evidence. Indeed, the facts being shown even by White's own evidence, the verdict is contrary to law on those facts. And therefore I may say we do not have to perform the delicate function of setting aside a verdict as contrary to evidence, for courts always set aside verdicts that are contrary to law on admitted facts. On these facts, the jury departed from the instructions given by the court. For some reason or other, the jury seems to have become confused in the mazes of the case, or mistaken the law. Even under the syllabus in *Young* v. *Railroad Co.*, 44 W. Va. 218, (28 S . E. 932), that "the verdict of a jury will be held sacred

unless there is a plain preponderance of credible evidence against it, evincing a miscarriage of justice from some cause, such as prejudice, bias, undue influence, misconduct, oversight, or misconception of the facts or law," we would have to overrule this verdict on the plea in abatement. The evidence on Miller's side is credible,—virtually uncontradicted; the facts are shown by White's evidence; and the verdict is contrary to law. Judgment reversed, verdict set aside, new trial awarded, and remanded.

*Reversed.*