## CHARLESTON.

RICHARDS, ADMR., v. RIVERSIDE IRON WORKS.

Submitted June 10, 1904—Decided December 20, 1904.

1.  ADMINISTRATOR—*Claim for Damages Deemed Property.*

    C. was employed as a laborer by the defendant, at its manu-facturing plant in O. county, W. Va. While engaged under direction of defendant's labor foreman in tearing down a scaf-fold which had been erected by defendant, and belonged to it, he was injured by the falling of one of the platforms of the scaffold, and, from the effects of his injuries, died in Bellaire, in the state of Ohio, where he resided. He having died intes-tate, the county court of Ohio county committed his estate to R., sheriff of said county, to be by him administered. R., as administrator of C, instituted this action in O. county. At the time of his death, C. had no mansion house, known place of residence, any real estate, or any property, situate in the State of W. Va.; and since his death, no property belonging to him, or to his estate, except the claim for damages sued for in this action has come into this state. *Held,* That said claim against defendant in this action for damages for the death of plaintiff's intestate, must be deemed property within the meaning of our statute; that the county court of O. county had authority to commit the estate of C. to the sheriff of that county to be by him administered; and that said sheriff, as administrator of C., had the right to institute and prosecute this action. (p. 515).

·2.  PLEA.—*Special Plea Rejected, When.*

    Special pleas, which aver matters only, that may be given in evidence under the general issue, should be rejected. (p. 516).

:3.  ADMINISTRATOR.—*Security for Costs.—Non-Resident Decedent.*

    A resident administrator who brings an action in a court of

this state to recover damages under our statute for the death of his decedent, who was a non-resident, should not be required to give security for costs.     (p. 516).

4.   CAUSE OF DEATH.—*Accident or Disease.—Burden of Proof.*

Where, in an action for fatal injury, it becomes a question whether death resulted from the injury, or from disease with which it had become involved, the party causing the injury cannot escape full liability without showing that death must have resulted, if the injury had not been done.   (p. 524).

5.   MASTER AND SERVANT.—*Safe Place to Work Required.*

If the master cause to be constructed, a scaffold in an unworkmanlike manner, and use therein defective or unsound materials, all of which render the scaffold dangerous and insecure, and the master or his foreman in charge of the work know it, or ought to have knowledge of it, by the exercise of reasonable attention, care and diligence, but direct such work to be done, and that character of materials to be used, he is liable to his workman, who being himself in the exercise of reasonable care, is injured thereby while working thereon, unless the workman, by the use of ordinary care, ought to have detected the unworkmanlike construction of, and the defective or unsound materials used in, the scaffold.   (p. 522).

6.   SYLLABUS APPROVED.

Point 4 of syllabus in *Andrews* v. *Mundy*, 36 W. Va. 22, approved and applied.   (p. 525).

7.   MASTER AND SERVANT.—*Ordinary Risks.*

When a servant enters into the employment of a master, he assumes all the ordinary risks, incident to the employment, whether the employment be dangerous or otherwise.   (p. 528).

Appeal from Circuit Court, Ohio County.

Action by H. C. Richards, administrator, against the Riverside Iron Works.   Judgment for plaintiff.   Defendant brings error.

*Reversed.*

WM. H. HEARNE, for plaintiff in error.

J. A. HOWARD and T. S. RILEY, for defendant in error.

MILLER, JUDGE:

John W. Campbell, the plaintiff's intestate, was before, and on, the 20th day of January, 1899, and also on the 16th day of

February, 1899, the time of his death, a resident of Bellaire, in the state of Ohio. For some time previous to the first mentioned date, he had been employed as a general laborer by the defendant, The Riverside Iron Works, a corporation, at its manufacturing plant in Benwood, Ohio county, West Virginia. A short time before January 20, 1899, a wooden scaffold, consisting of three platforms, had been built by defendant, to enable its bricklayers to work therefrom in re-building and painting for it a brick wall at one end of its stock house. The bricklayers worked on the scaffold with brick and other materials, and completed the wall after several days' labor thereon. Intestate, with other laborers, worked on the scaffold, attending the bricklayers, but did not assist in the construction of it. After the work on the brick wall had been completed, Campbell and Barkhurst, another laborer, were directed by one Lowe, a labor foreman, then in the employ of defendant, to tear down the scaffold. This Campbell and Barkhurst proceeded to do, and, while so engaged, the scaffold fell; they were thrown to the ground; Campbell was injured on the head and elsewhere about his body, and from the effects of his injuries so received, he died at his home in Bellaire, Ohio, at the time above stated.

On the 15th day of May, 1899, the county court of Ohio county committed the estate of said Campbell, deceased, to H. C. Richards, then sheriff of that county, to be administered. On the 28th day of June, next thereafter, Richards as administrator, commenced this action, in which he claimed $10,000.00 damages from the defendant on account of the death of his intestate, resulting from said injuries, occasioned as aforesaid. The defendant interposed its plea to the jurisdiction of the court in the action; and therein denies the right of the plaintiff to maintain his said action because it says that neither the said county court had jurisdiction to so commit the estate of said John W. Campbell, deceased, to said Richards to be administered, nor had said Richards, authority by reason of said action of the county court to institute or prosecute this action against defendant, for the following reasons, to-wit: that said John W. Campbell, who was, at the time of his death, a non-resident of the State of West Virginia, died intestate, in Belmont county, in the state of Ohio, where he then resided, and where his family still reside; that at the time of his death, he

had no mansion house or known place of residence, or any real estate, or any property of any kind, situate in the State of West Virginia; nor since then has he had any property in the last mentioned state, unless the claim sued for in the said action can be regarded as property.

A demurrer by the plaintiff to this plea was sustained by the court. This ruling of the court involves a construction of our statute, under which the action is brought and prosecuted. Section 5 of chapter 103 of the Code provides that: "Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof; then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter." The statute gives the right to institute and prosecute the suit. But for our statute, the action could not be maintained. The supreme court of Indiana, in *Jeffersonville R. R. Co.* v. *Swayne's Admr.*, 26 Ind. 477, 484, in discussing a similar statute, says: "The action given by the statute is for causing the death, by a wrongful act or omission, in a case where the deceased might have maintained an action had he lived, for an injury by the act or omission. The right of compensation for the bodily injury of the deceased, which died with him, remains extinct. The right of action created by the statute is founded on a new grievance, namely, causing the death, and is for the injury sustained thereby, by the widow and children, or next of kin of the deceased, for the damages must inure to their exclusive benefit. They are recovered in the name of the personal representative of the deceased, but do not become assets of the estate. The relation of the administrator to the fund when recovered, is not that of the representative of the deceased, but of a trustee for the benefit of the widow and next of kin. The action is for their exclusive benefit, and if no such person existed, it could not be maintained. *The Indianapolis, &c., R. R. Co.* v. *Keeley's Admr.*, 23 Ind. 133; *Lucus* v. *The New York, &c., R. R. Co.*, 21 Barb.

245; *The Chicago, &c., R. R. Co. v. Morris,* 26 Ill. 400; *The State* v. *Gilmore,* 4 Foster 461; *Lyon's Admr.* v. *Cleveland, &c., R. R. Co.,* 5 Gray, 473." Section 6 declares that: "Every such action shall be brought by and in the name of the personal representative of such deceased person; and the amount recovered in every such action shall be distributed to the parties and in the proportion provided by law in relation to the distribution of personal estate left by persons dying intestate. In every such action, the jury may give such damages as they shall deem fair and just, not exceeding ten thousand dollars, and the amount so recovered shall not be subject to any debts or liabilities of the deceased." Section 4 of chapter 85, provides that "in case of a person dying intestate, the jurisdiction to hear and determine the right of administration of his estate shall be in the court which would have jurisdiction as to the probate of his will, if there was a will." Section 22 of chapter 77 reads as follows: "The county court shall have power and jurisdiction to hear proof of, and admit wills to probate as follows: *First,* in the county wherein the deceased, at the time of his death had a mansion-house or known place of residence; or *second,* if he had no such house or place of residence, then in the county wherein any real estate devised thereby is situated; or *third,* if there be no real estate devised thereby, and the testator had no such house or place of residence, then in the county where he died, or in any county wherein he had any property at the time of his death." Sub-section 16 of section 17 of chapter 13 of the Code says: "The words 'personal estate' or 'personal property' includes goods, chattels real and personal, money credits, investments and the evidences thereof." It is suggested that the alleged right to recover damages from the defendant in this action is not property within the meaning of the law, but that, if such right be deemed property for the purposes of this action, the same was not consummated until the death of Campbell, which occurred at his legal residence in the state of Ohio, and that, therefore, the legal *situs* of the right, or property was and is in the state of Ohio. But it will be observed that our statute gives right to the action for death caused by injuries, which would have been actionable, had death not ensued, without regard to the residence of the decedent at the time of his death.

The statute is remedial, and should be construed liberally for the purpose of carrying out the legislative intent. *Marvin v. Maysville St. R. R. Co.*, 49 Fed. Rep. 438. In *Hartford & New Haven R. R. Co.* v. *Andrews,* 36 Conn. 215, the court says that the claim, if valid, is property, within the meaning of the statute; and that it was not the province of the court of probate to pass upon the validity of the claim. It was enough for that court to be satisfied that there was an apparent claim, and a *bona fide* intention to pursue it, and that administration was necessary to its pursuit. 2 Woerner Am. Law of Adm. section 306. "Personal property, whether of a tangible or an intangible character, is considered as located, for the purposes of administration, in the territory of that state whose laws must furnish the remedies for its reduction into possession." *Speed* v. *Kelley,* 59 Miss. 47, 51.

In *Perry, Admr.,* v. *St. J. & W. R. R. Co.,* 29 Kan. 420, an action upon a statue, almost identical with our own, it was held: "A claim for damages for causing the death of a party, under section 422 of the Code, is prosecuted by the administrator for the benefit of the widow and children or next of kin of the deceased, and is not an estate of the deceased to be administered within this state within the meaning of the act respecting executors and administrators. * * * A probate court has no jurisdiction to issue letters of administration on the estate of an intestate where such intestate is not an inhabitant or resident of this state at the time of his death, and leaves no estate in the state and none comes into it afterwards. * * * Where a probate court has no jurisdiction to issue letters of administration on the estate of an intestate, its acts in doing so are void for all purposes." In *Jeffersonville R. R. Co.* v. *Swayne, supra, Marvin* v. *Maysville R. R. Co., supra,* and *Central R. R. Co.* v. *Cragin,* 71 Ill. 177, the decisions are in accord with the Kansas case above cited.

A different conclusion, however, is reached in other states, where, as in our state, the fact that the statute gives such a right of action to the personal representative, and to him alone, implies the right to appoint, if necessary, an administrator to enforce it; and where there is property or a fund or right of action which cannot otherwise be made available, it is competent for the probate court to appoint an administrator for the sole

purpose of collecting and receiving assets which will not be general assets of the estate of his intestate or liable for his debts, but which will belong to particular persons who by law or by contract with the deceased will be entitled thereto. In such case, it is for the probate court to determine whether there is an apparent claim, a *bona fide* intention to pursue it, and that administration is necessary to its pursuit. That it is the duty of, the probate court to appoint under such circumstances seems to admit of no doubt; for if the right to bring the action is given to no one but an administrator, the refusal to appoint one would rather render the statute giving the remedy nugatory. 1 Woerner Am. Law of Ad. section 205; *Hutchins* v. *St. Paul R. R.,* 44 Minn. 5; *Brown* v. *L. & N. R. R.,* 97 Ky. 228, 232; *Findley* v. *Chicago R. R.,* 106 Mich. 700; *Morris* v. *Chicago R. R.,* 65 Ia. 727, 728; *Sargent* v. *Sargent,* 168 Mass. 420; *Hartford R. R.* v. *Andrews,* 36 Conn. 213. In the light of the authorities cited, we must hold that the county court of Ohio county had legal authority to commit the estate of the decedent to Richards as sheriff and that he, as such sheriff with the powers of administrator thus cast upon him, had the right to institute and prosecute said action against defendant. The court, therefore, did not err in sustaining the demurrer to the plea aforesaid.

Plaintiff in error complains that security for the costs of the action was not required of the plaintiff, and assigns this for error, on the ground that the residence of the distributees, or beneficiaries of the damages if any should be recovered, reside in the state of Ohio. We think this contention is not tenable. The residence of the plaintiff in the action, and the *situs* of, the demand, are in Ohio county. This being so, the law relating to security for costs does not apply.

The defendant also tendered two special pleas in bar,—one of which avers that it was not decedent's injuries, but the low order of his vitality, produced by, the use by him of intoxicating liquors, which produced his death;—and the other, that the injuries of the deceased were not of themselves sufficient to cause his death; but that his death was due primarily to his low order of vitality and his alcoholic condition, produced by the continuous drinking by him of liquors. Both of these pleas, upon objection thereto by plaintiff, were properly rejected, because everything averred therein could have been given in evidence under the

general issue. The pleas were, in effect, the general issue, which had been plead by defendant to the declaration and issue thereon joined. *Hagerstown* v. *Klotz,* 54 L. R. A. 940.

The material averments in the declaration are, that the scaffold was constructed by the defendant, its agents and servants, from old and defective timber, which, on account of its defects and unsoundness, was. unfit to be used in the construction thereof; that the defendant, its agents and servants well knew of the unsoundness and unfitness of the timber, at and before the scaffold was constructed therefrom; that the defendant negligently and wilfully permitted the timber to be used in the construction of the scaffold; that the scaffold was built in an unworkmanlike manner; and that by reason of the unsound and defective materials, and the unworkmanlike manner in which the scaffold was built therefrom, the scaffold was dangerous and unsafe; that, with knowledge of the dangerous and unsafe condition of the scaffold, defendant ordered and directed the plaintiff's intestate, who had no notice thereof, and was not aware of the insufficiency, unsoundness or dangerous condition of the scaffold, to ascend the same for the purpose of tearing it down; and that while tearing the scaffold down, as directed and ordered to do, it gave way, thereby precipitating decedent to the ground, and thus causing him injuries from the effects of which he died.

Charles Grimm testifies that he was at the time, and before Campbell was injured, the foreman of the defendant, Riverside Furnace. He says: "I had the scaffold built to enable the bricklayers to do some work in trimming up the end of the stock house. The scaffold had three platforms." J. W. Detter, a carpenter, testifies that he is a carpenter, and had charge of the construction of the scaffold under Grimm, who told him what to do, and who had authority to tell him what to do. The material used in its construction, was taken from a pile of lumber, belonging to defendant, near by, and by direction of defendant's foreman. Most of the lumber had been used before. There is no question about the soundness of the four uprights of the scaffold, but there is evidence tending to prove the unsoundness and weakness of the other lumber used therein. Speaking of the look-outs which held the uprights in place and also supported the floors of the several platforms of the scaffold, Mr. Hughes, a carpenter, who with one Reilly, put up the scaffold,

says: "Well, the timber was pretty knotty and also wind-shaky." He further testifies that some of the look-outs were doubled, but states, as to the strength and sufficiency of the scaffold: "Well, I didn't think that it was a good scaffold. I wouldn't consider it a good scaffold."

Campbell, the decedent, and Barkhurst, commenced on the third and upper platform to tear down the scaffold. They threw off the boards and knocked the look-outs from the up-rights on that floor; then went down to the second and did the same, and thence to the first. While they were standing on that floor or platform, about two minutes after they reached it, a look-out, supporting one end of the floor gave way, and decedent and Barkhurst were thrown to the ground. One of the look-outs of the lower platform was afterwards seen hanging by the nails at one end from an upright to which it had been fastened, the other end having given way entirely. There is other evidence tending to prove the same and other facts, and some testimony tending to contradict them. Suffice it to say that the evidence upon the material points in issue is somewhat conflicting and contradictory.

It was shown that some of the lumber used in the scaffold had knots in it. J. W. Detter was asked to what extent a board is weakened by a knot. The question was objected to by defend-ant. The objection was overruled, and exception made. His answer was: "Well, in my experience, a knot is equal to noth-ing; a knot might just as well be out, as far as strength is con-cerned. It don't amount to anything. That is my experience in carpenter work." He further said that "a knot weakens the board as much as a hole the same size." He had been carpen-tering for thirty years, and was the person in charge of putting up the scaffold. We see no reason why his evidence should have been rejected. G. V. Hughes, a carpenter, who had worked at his trade for twenty years, and who assisted in constructing the scaffold, was also a witness for plaintiff. The following ques-tions propounded to him, and the answers thereto, were per-mitted, over the objections of defendant: "Ques. Now state what you know as to the character of the timber in those look-outs, and as to their fitness for the use that was made of them. Ans. Well, they were not fit for the use they were made of.\* \* Ques. Why? Ans. Because it was not of proper material."

The witness had had long experience in working timber and lumber, and also possessed actual knowledge of the material used in the scaffold. His evidence was therefore proper. The court did not err in allowing it to go to the jury. There are several other interrogatories to witnesses, the several answers to which were objected to by defendant, but allowed to go to the jury as evidence. A discussion and decision of them here *seriatim* would involve much time and great labor. We have examined them carefully and are unable to detect any error of the court in respect thereto, prejudicial to defendant.

The court, at the instance of the plaintiff, gave to the jury the following instructions:

No. 1. "The court instructs the jury that the law imposes upon the defendant Company, the duty of furnishing its employee with reasonable safe and sound material with which the employee may be engaged in and about the doing and performing of his work; and a failure of the defendant Company to discharge this duty is in the law negligence for which the Company is liable. Therefore in this case if the jury believe from the evidence that the scaffold upon which the plaintiff's decedent was working by reason of weakness or defectiveness in the material of which it was constructed, was not sufficiently strong to support itself together with the weight that the scaffold was sustaining by the work then and there being done by the plaintiff's decedent in the course of his duties, and that by reason of such weakness or defectiveness the said scaffold fell and thereby injured the plaintiff's decedent and caused his death, then it is the duty of the jury to find for the plaintiff."

No. 2. "The court instructs the jury that if they believe from the evidence that the witness, Detter, was put in charge of the construction of the scaffold in question, and of the men constructing the same, by the defendant, then his acts in the performance of his duties as a foreman in the construction of said scaffold were the acts of the defendant company, and the defendant is liable for any negligence or want of proper care on his part, or the workmen in his charge, in the selection of the timber or the construction of said scaffold."

No. 3. "The court instructs the jury that if they find for the plaintiff the damages are not limited to the losses sustained at the precise period of Campbell's death, but may include pros-

pective losses provided they are such as the jury believes from the evidence will result to his distributees as the proximate damages arising from the wrongful death, and the jury may take into consideration in estimating the pecuniary injury the nurture, instruction, physical, moral and intellectual training which the children would have received from their father, and as a whole assess such damages as in the opinion of the jury will be fair and just, not exceeding in amount $10,000." To which instructions, and each of them, defendant excepted.

The action of the court in refusing to give the following instructions was also excepted to by defendant:

No. 5. "If the jury believe from the evidence in the case that the Riverside Iron Works, by its officers and agents, was guilty of negligence in the construction of the scaffold, which negligence of construction caused the injuries to the plaintiff's intestate, nevertheless the jury are instructed that they must find for the defendant if they further believe that the injuries received by the plaintiff's intestate would not have produced death had it not been for the low order of vitality of the plaintiff's intestate produced by long and continuous drinking of alcoholic and malt drinks by the plaintiff's said intestate."

No. 6. "If the jury believe from the evidence in the case that the injuries to the plaintiff's intestate would not have caused death had not the plaintiff's intestate been of low order of vitality, occasioned by the drinking of alcoholic and malt drinks, then the jury are instructed that they must find for the defendant."

No. 7. "If the jury believe from the evidence that one end of one of the lookouts which supported the platform and which gave way was so far detached from the upright to which it had been nailed as to have been discoverable upon inspection or examination by the plaintiff's intestate when upon the scaffold had he looked or used his eyes, then the jury are instructed that they must find for the defendant."

No. 8. "If the jury believe from the evidence that from some cause one end of one of the lookouts which supported the platform which gave way was detached in whole or in part from the upright to which it was nailed in some manner, and that the defendant was not aware that the said lookout had been so

detached as aforesaid, then the jury must find for the defendant."

No. 9. "If the jury believe from the evidence that defective materials were used in the construction of the scaffold, yet they are instructed that they cannot find a verdict against the defendant unless they further believe that the use of such defective material was the cause of the injury to the plaintiff's intestate."

No. 10. "If the jury believe that the same injury would have resulted to the plaintiff's intestate even if the best of material had been used, they must find for the defendant."

No. 11. "The jury are further instructed that they must find for the defendant if they believe the injuries to the said John W. Campbell arose from the negligence of a fellow servant or workman either in the selection of the material from which the scaffold was constructed or in the unworkmanlike manner in which it was built."

The jury found a verdict in favor of the plaintiff for $3,500.00, and also returned with their verdict four several questions in writing, which had been submitted to them by the court, on motion of defendant, with the several answers thereto, which are in the words and figures following:

"Q. 1. Was not the injury to John W. Campbell in the opinion of the jury, caused by one end of one of the look-outs supporting the third or lowest platform becoming detached at one end from one of the uprights? A. Yes.

"Q. 2. What caused the look-out supporting the platform from which John W. Campbell fell to give way? A. Faulty construction and insufficient bracing.

"Q. 3. Was it not the case, that the dropping of boards by John W. Campbell, or his fellow workman, Harry Barkhurst, in tearing down the platforms above, by one or more of the boards composing the platforms falling upon the look-out which gave way, the cause of its becoming detached? A. No.

"Q. 4. If the look-out that gave way and which supported the platform which gave way was unsafe, either before or after John W. Campbell and Harry Barkhurst went on the scaffold to tear it down, did not John W. Campbell have better or at least equal means of ascertaining the unsafe condition of the lookout than the defendant? A. No."

A motion of defendant to have the veridct set aside, and a

new trial of the action granted to it, was overruled by the court. Judgment was then rendered on the verdict. All of the rulings and other proceedings in the case, with the evidence heard upon the trial thereof, are saved and certified in a bill of exceptions, which is made part of the record. The questions arising on the instructions will be first determined.

It is a well established general proposition that under the common law in America a master is liable to his servant for any neglect of the master's duty, whether committed by the master himself, or by one to whom he has delegated his authority. *Madden's Admr.* v. *C. & O. R. R. Co.,* 28 W. Va. 610; Ray on Neg. Imp. Duties, 35. The test of liability is the negligence of the master, not the danger of the employment, though the danger of the employment may determine the ordinary care required in the case. *Stewart* v. *O. R. R. Co.,* 40 W. Va. 188. Buswell on Pers. Inj. 391, 392, says: "So if the material used in erecting scaffolding is bad, and the master knew it, but directed the material to be used, he is liable to his workmen, who being themselves in the exercise of due care, are thereby injured. But if the workman ought to have detected the defect; or if this was due to his own fault, or, it is said, that, of his fellow workmen, the master is not responsible. But the duty of the master in this respect is not to be avoided by delegating it to another, whether to a fellow servant of injured employee, or to a contractor, if the means of doing the work are furnished by the owner, and are defective. For the master, when acting through an agent, undertakes that his agent shall be a suitable person for the position he holds, and is responsible for his negligence." Buswell on Pers. Inj. section 193; *Corcoran* v. *Holbrook,* 59 N. Y. 517; *Chicago &c. R. R. Co.* v. *Jackson,* 55 Ill. 492; *Northern Pac. R. R.* v. *Herbert,* 116 U. S. 650; *Behm* v. *Armour, et al,* 58 Wis. 1. In *Roberts* v. *Smith et al,* 2 H. & N. (Eng. R.) 213, it is stated in the syllabus that: "At the trial, it was proved that the defendants had employed a labourer to erect the scaffold. The materials for the scaffold were in bad condition. The labourer broke several of the putlogs in trying them. One of the defendants told him to break no more, that the putlogs would do very well. The labourer used such as he thought sound. One of the putlogs so used having given way the scaffold fell, and the plaintiff was injured. On this evi-

dence, the judge at the trial directed a nonsuit,—*Held,* on ap-
peal to the Court of Exchequer Chamber, that there was evi-
dence to go to the jury of the liability of the defendants." The
materials for the scaffold under consideration here were taken
from the lumber pile of defendant near by. The laborers of
defendant were directed by defendant's foreman to take the
lumber from that pile. Some of it is shown to have been de-
fective and unsound. Some of the lookouts were knotty. Det-
ter and Hughes took the materials for the scaffold from the lum-
ber pile, by order of Grimm, defendant's turn boss. Their at-
tention was called to the defects in the lumber used for the look-
outs. The defendant had good material on the ground; but it
was not used because Grimm directed the use of the lumber
which went into the scaffold. Decedent did not assist in hand-
ling the materials for, or aid in, building the scaffold. He is
not shown to have had any knowledge of its unsound or unsafe
condition. The part which gave way, and precipitated him to
the ground was a lookout, answering to a joist, which was cov-
ered by, and supported one end of the boards of that platform.
While the defendant contends that intestate did not observe,
but could have observed any defects in the materials of the
scaffold or in its workmanship, by the exercise of ordinary care,
this circumstance, connected with the fall of the scaffold, seems
to negative that presumption. We do not think that plaintiff's
intestate was bound, under the law, to make an examination of
the scaffold, before going upon it to work.

It is held in *Clark* v. *Liston,* 54 Ill. App. 578, cited by plain-
tiff in error, that "in the destruction of a building there is no
attempt or obligation to make it secure; the work of re-moval is
one in which in turn each of the structure is rendered insecure;
this every workman understands and must be governed accord-
ingly." But the court in that case also says: "Plaintiffs in
error were not bound to furnish Liston a safe place in which to
work; while they *were* under an obligation not to send him into
a place they knew to be dangerous, and which he could not by
the use of ordinary care perceive to be so." The jury, in answer
to question No. 4, say that Campbell did not have equal means
with defendant for ascertaining the unsafe condition of the
lookout which gave way; and, in answer to No. 2, they further
say that faulty construction and insufficient bracing caused the

lookout supporting the platform from which Campbell fell, to give way. The master owes the duty in all cases, of disclosing to the servant defects and dangers of which he (the master) ought to have knowledge by the exercise of reasonable attention, care and diligence, and of which the servant has no knowledge, and would not discover by the exercise of reasonable care. Dresser on Emp. Liability, 464; *Hough* v. *Railway Co.*, 100 U. S. 213; 53 Am. R. 702; 1 Am. St. R. 584. Upon the facts as presented, the plaintiff's instructions appear to propound the law correctly. It was not error to give them.

Defendant's rejected instructions Nos. 5 and 6 do not state correct. legal principles. They, in effect, say to the jury that if the injuries received by the intestate, together with another antecedent cause, occasioned his death, they must find for the defendant.

In *Beauchamp's Admr.* v. *Saginaw Mining Co.*, 50 Mich. 163, it is held that where, in an action for fatal injury, it becomes a question whether death resulted from the injury, or from some disease with which it had become involved, the party causing the injury cannot escape full liability without showing that death must have resulted, if the injury had not been done. *Louisville & N. R. R. Co.* v. *Jones*, 83 Ala. 376; Cooley on Torts (2d Ed.) 76; Tiffany, Death &c. section 76. There being no proof upon which said instructions could be based, they were and are irrelevant, and were properly refused.

Nos. 7 and 8 assume that the lookout became detached from the upright, and that the injury was occasioned to intestate thereby. No such assumption by the court would be permissible.

Nos. 9 and 10 are the same, in substance, as instruction No. 3, given at the instance of the defendant, in the words following: "If the jury believes that the same injury would have resulted to the plaintiff's intestate even if the best of material had been used, unless the jury believe the accident resulted from defective workmanship in the manner in which scaffold was put together, then they must find for the defendant." Where an instruction has already been substantially given, the court is not bound to repeat it. *Kerr* v. *Lunsford*, 31 W. Va. 659; *Davidson* v. *P. C. C. & St. L. Ry. Co.*, 41 W. Va. 407. Under this rule, the two instructions last mentioned were and are improper. No. 11 submitted to the jury a question of law relating to fel-

low servants, and also a question of fact, and was and is there-fore erroneous. It is the duty of the court to determine the law, and the province of the jury to find the facts. "All of the ad-judications recognize the principle that to the court, in civil cases, belongs the law; to the jury, the facts." 1 Rob. (Old) Practice, 342. So, if a party submit a question involving facts with law, and demand the opinion of the court on both, the motion for such opinion may be overruled. *Idem* 340. In-struction No. 11 was not erroneously rejected.

Defendant also requested the court to submit the following five questions to the jury, for answers:

"No. 5. Was not the lookout which gave way and let the platform fall, unbroken, and the nails in the end at which it became detached, still in it, after it became detached and after John W. Campbell had fallen?

"No. 6. Would the wounds, in the opinion of the jury, occa-casioned by the fall of John W. Campbell, have produced death to a man in good physical condition and state of health previ-ous to that fall?

"No. 7. Was not John W. Campbell at that time of his fall, in a low order of vitality by reason of his previous drinking of alcoholic and malt drinks?

"No. 8. Would not the lookout which became detached, if caused by falling boards, as asked in the question just preced-ing, have been caused whether the scaffold was constructed of good and proper material, and erected in a workmanlike man-ner, or the reverse?

"No. 9. Could the defendant, by any inspection before Harry Barkhurst and John W. Campbell went on the scaffold to tear it down have detected that the lookout which supported the plat-form from which John W. Campbell fell, and which gave way, was in any particular unsafe, dangerous or in any wise de-tached from the uprights to which it was nailed?"—which ques-tions the court refused to submit, and thereupon the defendant again excepted.

In *Andrews* v. *Mundy*, 36 W. Va. 22, it is held that, "sub-mitting to the jury particular questions of fact, under our statute, is within the discretion of the trial court, subject to review; but it is not erroneous to refuse to permit such ques-tions to be propounded when they are immaterial or irrelevant;

and, unless the answers thereto, if contrary to the general verdict, would control the same, and be conclusive of the issue." All of the rejected questions, except possibly No. 8, are obnoxious to the rule above stated. No. 8, in effect, assumes that the lookout became detached by reason of the falling boards. This assumption is a mere inference. Besides, the scope of questions, Nos. 2 and 3 already allowed permitted any answer which might have been given under No. 8. It was not error to refuse all of said rejected interrogatories.

We now come to the most important question in the case: Did the court err in overruling the motion to set aside the verdict, and to grant a new trial? That the scaffold fell, and that its fall caused the injuries to the decedent, from which he died, is conclusively established. But "the mere fact of injury received by the servant raises no presumption of negligence on the part of the master." *Knight* v. *Cooper,* 36 W. Va. 232. In *Johnson* v. *C. & O. Ry. Co., Idem* 73, it is held that, "from the mere fact the injury results to a servant from a latent defect in the machinery or appliances of the business, no presumption of negligence on the master's part is raised. There must be evidence connecting him with the injury. The mere fact that machinery proves defective, and that an injury results therefrom, does not fix the master's liability." There is much evidence that faulty material was used for the lookouts; but it is also shown by a great preponderance of the evidence that the lookouts which were made from faulty material, were placed in the uppermost, and in the second or middle, platforms; and that no defective or faulty material was used for the lookouts of the lower platform, the falling of which caused the injury to decedent. It is also shown that a broken lookout was seen after the fall of the scaffold; but that it had belonged to, and supported either the uppermost or the second, platform. It is proved *that the faulty material used* in the scaffold was not used for the lookouts of the lower platform.

As above stated, the jury found, and properly so, as we believe, that the injury to Campbell was caused by one of the lookouts, which supported the lowest platform, becoming detached at one end, from the upright to which it had been nailed; and the jury further found, that the cause of the detachment, or giving way of that end of the lookout, was due to faulty

·construction and insufficient bracing. We have evidence that the scaffold was braced one way from the northwest post, (or upright,) to a window in the stock house; and was also braced from the southwest post into a beam, which ran from a shed to the stockhouse. The witness says: "Those braces would have the effect of preventing the scaffold from toppling over; that is all they had to do,—keep the scaffold standing. They had nothing to do with the strength of the scaffold, only to hold it up." It also appears that after its completion, and before it was torn down, the scaffold had served its purpose. The brick-layers, and their attendants, who furnished the brick and other materials for the repair of the stockhouse, had worked upon the platforms of the scaffold without any part of it having given way, so far as the evidence discloses. Regarding the lookouts of the third, or lowest platform, Mr. Hughes further testified: "I think they were sufficiently strong." One of the witnesses did not think that the scaffold was a good one,—he did not consider it a good scaffold. He does not specify any particular part of it wherein the scaffold was faulty in construction. In fact, there is no evidence, found by us, which specifically points out wherein *the construction* of the scaffold was unworkmanlike, or faulty. Barkhurst says that he and Campbell went upon the first or uppermost platform, and threw off the boards of that floor; and with a sledge, weighing from eight to twelve pounds, knocked off the lookouts and braces from the uprights without any particular care; and then went down to the next, or second platform, and did likewise. Three of the uprights to which the lookouts and braces, near the top of the scaffold, were fastened, were 4x4 inches in size, and the other 4x6 inches. They were about thirty-two feet in length, and, therefore, of considerable weight. After the braces and lookouts above were removed, the uprights not being otherwise held together, would cause great strain or tension on the lowest lookouts. Our observation and experience teach us that the destruction, and manner of demolition, of the scaffold would necessarily weaken it, as the work thereof pro-gressed. "Every person is presumed to know facts of common every day experience, and the court takes judicial notice of such common knowledge. When, therefore, the risk arises from a condition of things which common experience recognizes as dangerous, the plaintiff is presumed to know and appreciate

the danger, and cannot be heard to deny it or offer evidence upon the subject." Dresser, *supra,* section 95.

Speaking of the master's duty, 1 Sher. & Red. on Neg. 316, says: He is not bound to keep the place of work constantly safe, when the servant's work, in its very nature, renders the place, for the time, unsafe, nor where the very work which the servant is employed to do, is to make a dangerous place safe. *Clark* v. *Liston, supra.* A workman employed in a quarry, in which, by reason of the constant removal of stone therefrom in the course of its operation by himself and his fellow servants, the conditions and surroundings are constantly changing, assumes the risks of the place becoming unsafe, and cannot recover for an injury due to the falling of a mass of stone loosened by succeeding blasts. *Mielke* v. *Chicago & N. W. R. Co.,* 103 Wis. 1; 54 L. R. A. 139; *Peffer* v. *Cutler,* 83 Wis. 281; *Larsson* v. *McClure,* 95 Wis. 533; *Petaja* v. *Aurora I. M. Co.,* 106 Mich. 463.

The dangerous condition of the scaffold was occasioned by the work of its own destruction, which was performed by the decedent and his fellow laborer, in a manner that necessarily increased the danger to themselves, as the work progressed. The extent of the danger of this work to decedent, the defendant could not possibly foresee, and against which it could not, and was not required to, guard. By acceptance of the employment a servant assumes all risks of injury caused by the dangers incidental to the business. No duty is imposed upon the master to protect the servant against these risks, and he consequently cannot be guilty of negligence. Dresser, *supra,* section 88.

In *Berns* v. *Coal Co.,* 27 W. Va. 285, it is held, that, when a servant enters into the employment of a master he assumes all the ordinary risks incident to the employment, whether the employment is dangerous or otherwise. *Reese* v. *Wheeling & E. G. R. Co.,* 42 W. Va. 333. Applying the legal principles above stated to the facts and circumstances of the case, it is plainly evident that the scaffold was rendered weak and dangerous by the work done thereon by decedent and his fellow workman, in and about its removal, which they were employed to accomplish, and that decedent must have known the danger incident to that undertaking, and assumed the risk of such danger.

It is well settled law that where a case has been fairly sub-

mitted to a jury, and a verdict fairly rendered, it ought not to be disturbed by the court, unless manifest wrong and injustice has been done, or unless the verdict is plainly not warranted by the evidence, or facts proved. *Miller* v. *Ins. Co.,* 12 W. Va. 116; *Grayson* v. *Com.,* 6 Grat. 712. In the case last cited, it is held that a new trial will be granted where the verdict is against law, or where it is contrary to the evidence, or where the verdict is without evidence. *Miller* v. *White,* 46 W. Va. 67.

We are of opinion that the verdict is plainly contrary to the law and the evidence. Therefore, the judgment is reversed and annulled; the verdict set aside; a new trial granted; and the case remanded.

*Reversed.*

Brannon, Judge, (*concurring*):

I concur in the opinion and conclusion reached by Judge Miller. I wish to add a few words of my own as a reason weighing much with me in favor of the decision in this case. It is evident that a theory for recovery, indeed the sole ground for recovery, was that bad material was used in the construction of the scaffold. There is no evidence to sustain the verdict on that basis. The plaintiff's very first instruction, which I think induced the verdict, was that if bad material was used, and because of that the scaffold fell, then the jury must find for the plaintiff. The evidence did not support that theory. No bad wood was used in the platform which fell. This instruction presented, with the sanction of the court, to the consideration of the jury, the question whether bad wood was anywhere used in the scaffold, and whether there was ground for recovery on account of that bad material. This would mislead the jury to a false issue, an immaterial issue, under the whole evidence. A verdict on that basis would not stand. *Bloyd* v. *Pollock,* 27 W. Va. 75, tells us that though there is some evidence going to sustain the theory contained in an instruction, yet if it is not sufficient to sustain a verdict, and it would be the duty of the court to set aside a verdict resting on that theory, it ought not to be given. *McDonald* v. *Cole,* 46 W. Va. 186; *State* v. *Belknap,* 39 *Id.* 427; *State* v. *Mann,* 48 W. Va. 480; *Pasley* v. *English,* 10 Grat. 236. By statute and practice this Court has power to set aside a verdict on insufficient evidence. So has a circuit

court.  *Davidson* v. *Railroad,* 41 W. Va. 408.  A court may direct a verdict when the evidence is not enough to sustain a recovery or defense, or may strike out the evidence.  *Ketterman* v. *Railroad,* 48 W. Va. 606, 613; *Tomason* v. *Southern,* 113 Fed. 80.  The judge is responsible for the trial at last, and should not allow investigation or give instruction upon questions not really and practically before the jury under the evidence. Why instruct a jury and tell it to pass on a matter when he would have to set aside the verdict standing on that question?  Notwithstanding the ability of the judge presiding at this trial, I am impelled to the opinion that plaintiff's instruction No. 1 was inapt in this case.  I do not see why interrogatory nine asked by defendant was not proper.