315 S.E.2d 593

**E. Jean ORR**

v.

**Daniel B. CROWDER, etc., et al.**

**No. 15477.**

Supreme Court of Appeals of West Virginia.

Dec. 16, 1983.

Dissenting Opinion Jan. 25, 1984.

Rehearing Denied Jan. 31, 1984.

---

Chauncey H. Browning, Atty. Gen., and David P. Cleek, Deputy Atty. Gen., Charleston, for appellants.

O'Brien, Cassidy & Gallagher and Patrick S. Cassidy, Wheeling, for appellee.

MILLER, Justice.

The defendants, Daniel Crowder, president of the West Virginia Northern Community College (hereinafter the College), and Gregory Adkins, the College's dean of academic affairs, are appealing the judgment entered against them in an action brought under 42 U.S.C. § 1983[1] in the Circuit Court of Kanawha County. The plaintiff, E. Jean Orr, who was formerly a librarian at the College, was awarded damages totaling $26,400 against Drs. Crowder and Adkins, as well as attorney's fees in the amount of $10,405.75 against the West Virginia Board of Regents.[2]

Although additional errors are asserted, the primary contention of the defendants is that Mrs. Orr was not entitled to any relief as a matter of law. Therefore, the defendants argue, the trial court erred in refusing to grant the defendants' motions for a directed verdict. We disagree with the defendants and affirm the judgment.

After the defendants had given Mrs. Orr a one-year terminal contract for the 1976–77 school year, she filed this civil action alleging that the defendants had violated her procedural due process and her free speech rights under the First Amendment to the United States Constitution. Her procedural due process claim was based on her contention that she had acquired tenure rights, arising from agreements made with the defendants, and therefore, was entitled to the procedural protections afforded to dismissed tenured faculty members. The First Amendment cause of action was grounded in the plaintiff's argument that she was given the terminal contract as a result of her criticizing proposed plans for the remodeling of the College's Learning Resources Center.

The facts surrounding Mrs. Orr's status with the College may be briefly summarized. Additional facts to illuminate her two causes of action will be discussed separately. Mrs. Orr was hired initially in 1971 as a librarian at the Wheeling campus of West Liberty State College, which was later reorganized as the West Virginia Northern Community College. Her employment continued for five years under one-year contracts until the spring of 1976, when she was given the terminal contract.

During her employment, she was promoted from librarian to director of library services, which involved supervising and administering the personnel, libraries, and related services not only at the Wheeling campus but also the Weirton and New Martinsville divisions of the College. Her title was changed to director of learning resources in 1975.

During the critical period, i.e. the 1975–76 school year, when Mrs. Orr contends the events occurred that led to her being given a terminal contract, the president of the College was Dr. Crowder and her immediate superior was Dr. Adkins. It was Dr. Adkins who recommended the terminal con-

1. 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

2. This is the only issue raised by the Board of Regents and it is discussed in Part IV. All other errors are assigned by the individual defendants.

tract, which recommendation was concurred in by Dr. Crowder.

## I. PROCEDURAL DUE PROCESS CLAIM

Mrs. Orr's procedural due process claim is based, in large part, on the fact that in 1973, the West Virginia Board of Regents gave college presidents the authority to grant faculty status to librarians. The plaintiff contends that in conversations with Drs. Adkins and Crowder in the fall of 1975 she was promised faculty status and that such faculty status would be made retroactive to July, 1971, the date on which she was first hired. Drs. Adkins and Crowder, while admitting faculty status was offered to Mrs. Orr, testified that they agreed to extend it back to July, 1974, not July, 1971.

Mrs. Orr relies heavily on *State ex rel. McLendon v. Morton*, 162 W.Va. 431, 249 S.E.2d 919 (1978), where we provided some procedural due process rights to an assistant professor at a community college who had met the eligibility standards for tenure. In Syllabus Point 3 of *McLendon* we said:

"A teacher who has satisfied the objective eligibility standards for tenure adopted by a State college has a sufficient entitlement so that he cannot be denied tenure on the issue of his competency without some procedural due process."

*McLendon* in turn relied on *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), where the United States Supreme Court recognized that property interests could not be withdrawn by governmental action without appropriate due process procedures. In *Roth*, the United States Supreme Court indicated that protected property interests were not limited to the traditional concepts of real and personal property. It pointed out that a benefit which merits protection as a property interest is one to which there is more than a "unilateral expectation," and there must exist rules or understandings which

can be characterized as giving the claimant "a legitimate claim of entitlement to [the benefit]." 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.

*Roth* involved an assistant professor at a state university who had been hired on a one-year contract that was not renewed. A state statute granted tenure after four years of continuous service. The United States Supreme Court held that since he did not have the requisite years of service, he did not have a protected property interest that would be afforded constitutional procedural due process protection.

In *Perry*, a professor had been employed for four years at a junior college. He claimed that the college had a de facto tenure program under which he qualified. The United States Supreme Court concluded that his claim had been improperly dismissed since he was not given the opportunity to prove the existence of and his eligibility for the de facto tenure program. It concluded that if the professor could establish these facts, then he would have shown a legitimate claim of entitlement to tenure and would be entitled to procedural due process protection.

The plaintiff's claim for tenure eligibility must be viewed against several facts which are undisputed. First, it was not until 1973 that the Board of Regents gave discretionary authorization to college presidents to extend grants of faculty status to librarians. Second, there was no formal policy adopted by the Board of Regents as to how the discretionary grant of faculty status for librarians should be awarded. Furthermore, there was no policy formulated with regard to whether a librarian given faculty status could receive credit toward tenure for the years worked prior to faculty status designation.

It is this lack of any formal policy for retroactive faculty status that forms the heart of the controversy on the tenure eligibility issue. The plaintiff argues that she was promised faculty status retroactive to July, 1971. With this as her beginning date, plaintiff states that she would have accumulated five years of faculty status at

the end of the 1975–76 academic year, which would have then given her tenure eligibility under *McLendon*.[3]

The evidence on the offer of retroactive faculty status is diametrically opposed. The plaintiff asserts that after several meetings with Drs. Adkins and Crowder, she was orally promised faculty status back to her initial employment in July, 1971. According to the plaintiff, this promise was made in a meeting with Drs. Adkins and Crowder on November 20, 1975. On the following day, the plaintiff wrote a memorandum to Dr. Adkins requesting some time to consider the offer. Prior to receiving any response to this memorandum, Mrs. Orr wrote another memorandum to Dr. Adkins dated December 4, 1975, in which she "accepted" the offer of retroactive faculty status. The defendants deny making such a promise to the plaintiff.

Near the end of 1975, Dr. Adkins advised the plaintiff that faculty status was granted to two other employees of the College's Learning Resources Center, retroactive to July 1, 1974. At this time, he also informed the plaintiff that her status would be determined after Christmas. The plaintiff wrote to Dr. Adkins requesting a decision on her faculty status and on February 24, 1976, Dr. Adkins responded that she would be granted faculty status effective July 1, 1974. This was confirmed by the College president, Dr. Crowder, in a letter dated April 6, 1976.

■ We believe that it is fundamental under *Roth* and *Perry*, as well as under *McLendon* and related cases, that before a protected property interest, such as a right to tenure, can be found, something more than a unilateral expectation must be shown. Plaintiff must demonstrate that there existed some rules or understandings governing tenure eligibility fostered by the college upon which the college employees relied. We do not believe that the plaintiff can create in an ex parte fashion the rules or understandings tailored to the facts of her particular case. If this were possible, every claim involving a unilateral expectation would be converted to a legitimate claim of entitlement by a plaintiff testifying that tenure had been promised in his particular case.[4]

■ The United States Supreme Court in both *Roth* and *Perry* took occasion to point out that legitimate claims of entitlement to job tenure "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561. *See also* note 7, *Perry*, 408 U.S. at 602, 92 S.Ct. at 2700, 33 L.Ed.2d at 580. Here there was no showing of any such general understanding or rule with regard to retroactive faculty status.

■ The plaintiff urges two additional points in regard to her procedural due process claim. First, she claims that Dr. Crowder was obliged to accept the recommendation of the faculty appeals committee, which had considered her claim for retroactive faculty status and had found that the plaintiff was entitled to faculty status as of July 1, 1971. However, there was no administrative policy at the College nor any requirement under the Board of Regents' Policy Bulletin No. 36 making such a recommendation binding upon Dr. Crowder. Under the Board of Regents' Revised Policy Bulletin No. 40, college presidents are empowered to make the final decisions at the college level on all

3. In order to have prevailed on this point, the plaintiff had to prove that the 1974 amendment to the Board of Regents' Policy Bulletin No. 36, increasing the tenure eligibility period from five to six years, was not applicable to her. In view of our holding that she does not have a protected property interest and, therefore, was not entitled to procedural due process protection, we do not address this issue.

4. We do not accept the plaintiff's argument that because two of the librarians under her were granted faculty status as of July 1, 1974, which was the date they were first employed, this established a retroactive faculty status policy applicable to all employees. The evidence demonstrates that the discussions as to the date of faculty status for librarians had been primarily between the plaintiff and Drs. Adkins and Crowder. There was no established policy and different dates were discussed. We do not find a policy predating the discussions which would provide some type of entitlement.

personnel matters,[5] subject to the right of appeal to the Board of Regents under its Policy Bulletin No. 36.[6]

■ Her other procedural due process issue was that she was entitled to be evaluated by a faculty member instead of by Dr. Adkins. The College had an evaluation policy, Defendants' Exhibit No. 3, and under it, Mrs. Orr as an administrator of the library was supposed to be evaluated by Dr. Adkins. We find no merit factually on this point.[7]

For the foregoing reasons, we agree with the defendants that the plaintiff's procedural due process claim fails as a matter of law.

## II. FIRST AMENDMENT CLAIM

Mrs. Orr claims that her termination resulted from her criticism in the fall of 1975 of the administration's proposed plan for remodeling the Learning Resources Center. These criticisms were voiced in one or more meetings at which Drs. Adkins or Crowder were present and caused them to become angry with her. From this point on, the plaintiff claims that her relationship with them deteriorated. Even though her suggestions were ultimately accepted, she received an adverse evaluation from Dr. Adkins which both he and Dr. Crowder utilized as a reason for giving her a terminal contract in the spring of 1976.

■ We recognize that under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), public employees are entitled to be protected from firings, demotions and other adverse employment consequences resulting from the exercise of their free speech rights, as well as other First Amendment rights.[8] However, *Pickering* recognized that the State, as an employer, also has an interest in the efficient and orderly operation of its affairs that must be balanced with the public employees' right to free speech, which is not

5. The West Virginia Board of Regents' Revised Policy Bulletin No. 40 states, in part:

"Subject to the limitations and conditions set forth in other West Virginia Board of Regents' policy statements and Board-approved budgetary limits, the president of each college and university under the governance of the West Virginia Board of Regents has final institutional level authority and responsibility for each and every personnel action on his or her particular campus, with the exception of decisions on tenure and matters relating to his or her own employment and compensation."

6. It should be noted that the plaintiff did have her one-year terminal contract reviewed by the Board of Regents, pursuant to Amended Policy Bulletin No. 36(9)(G), which requires the Board to review the nonretention decision to ensure that the nontenured faculty member's procedural due process and other constitutional rights were not violated. In this case, the Board ruled against the plaintiff. We also point out that W.Va.Code, 18–26–8c, which mandates a more extensive hearing process for probationary college faculty members who are not retained, was enacted in 1979 and therefore was not applicable to Mrs. Orr.

7. In addressing the last two points relating to the plaintiff's procedural due process claim, we have disposed of them based on the facts. From a legal standpoint, we are aware of cases which hold that procedural flaws in the termination of a nontenured person do not give rise to a constitutional procedural due process violation that will support a section 1983 suit. *See, e.g., Kilcoyne v. Morgan,* 664 F.2d 940 (4th Cir. 1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); *Clark v. Whiting,* 607 F.2d 634 (4th Cir.1979); *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1 (7th Cir.1974); *but see Piacitelli v. Southern Utah State College,* 636 P.2d 1063 (Utah 1981).

8. This statement was made in *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817:

"To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court."

While *Pickering* did not involve a section 1983 suit, it is clear that this statement of the law can be applied to any public employee whose employment status is adversely affected because the employee exercised his First Amendment or other constitutional rights. *E.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (Assistant district attorney); *Monsanto v. Quinn,* 674 F.2d 990 (3d Cir.1982) (Internal revenue officer); *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) (Police officers); *Egger v. Phillips,* 669 F.2d 497 (7th Cir.1982) (FBI agent).

absolute.[9] Consequently, some general restrictions on a public employee's right to free speech were recognized in *Pickering*. First, speech, to be protected, must be made with regard to matters of public concern. Second, statements that are made "'with the knowledge [that they] ... were false or with reckless disregard of whether [they were] ... false or not,'" are not protected. 391 U.S. at 569, 88 S.Ct. at 1735, 20 L.Ed.2d at 817. Third, statements made about persons with whom there are close personal contacts which would disrupt "discipline ... or harmony among co-workers" or destroy "personal loyalty and confidence" may not be protected. 391 U.S. at 570, 88 S.Ct. at 1735, 20 L.Ed.2d at 818.[10]

■ The primary argument advanced by the defendants against plaintiff's First Amendment claim is that she failed to show by a preponderance of the evidence that her criticism of the remodeling plans was a substantial or motivating factor in her being given a terminal contract. This is the test prescribed in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), where the United States Supreme Court allocated these evidentiary burdens:

"[T]he burden [is] properly placed upon [plaintiff] to show that his conduct [was] constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. [Plaintiff] having carried that burden, however, ... the Board had [to show] by a preponderance of the evidence that it would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484. (Footnote omitted)

■ We eschew any attempt to read the *Mt. Healthy* test as requiring the plaintiff to show that her exercise of her First Amendment rights was the "sole" or "only" factor precipitating the terminal contract. As the court said in *Bowen v. Watkins*, 669 F.2d 979, 984–85 (5th Cir. 1982): "The opinion in *Mt. Healthy* clearly contemplates that a decision may be the product of more than one substantial factor; it refers to '*a* substantial factor'. 429 U.S. at 287, 97 S.Ct. at 576 [50 L.Ed.2d at 484] (emphasis added)." *See also Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Leonard v. City of Columbus*, 705 F.2d 1299 (11th Cir.1983); *Boussom v. City of Elkhart*, 567 F.Supp. 1382 (N.D.Ind.1983); *Visser v. Magnarelli*, 530 F.Supp. 1165 (N.D.N.Y.1982).

The record fairly demonstrates that prior to October 5, 1975, the date on which the remodeling plans were shown to Mrs. Orr

---

**9.** This point was expressed as follows in *Pickering*:

"At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734–35, 20 L.Ed.2d at 817.

**10.** In the present case, the defendants do not argue that any of the *Pickering* restrictions on free speech are present. The only possible *Pickering* question is whether the plaintiff's criticism of the remodeling plans constituted matters of public concern. We believe that her criticism

of the plans can properly be considered as relevant to a matter of public concern since the comments related to the design of a facility to be used by the public. *See Montgomery v. Boshears*, 698 F.2d 739, 743 (5th Cir.1983) ("[P]laintiff criticized verbally and in letters to the university the appointment of her supervisor and the implementation of a library computer system. We will assume that these statements [are] ... 'matters of public concern.'"); *Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900 (Colo.1982) (en banc) (Plaintiff's criticism of construction plans for a hotel held to be protected speech). Furthermore, the fact that plaintiff's criticism was voiced at faculty staff meetings and to both Drs. Adkins and Crowder does not diminish the "public" character. Under *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), statements made only to one's superior are protected public utterances if relevant to a public matter.

by Dr. Adkins, there had been relatively little controversy between Mrs. Orr and either Drs. Adkins or Crowder. Prior to this time, Mrs. Orr had had some preliminary discussions with her superiors regarding the faculty status question under the Board of Regents' discretionary authorization. However, it does not appear that these discussions had resulted in any concrete proposals nor does it appear that they engendered any ill feelings.

It also does not appear that there was any objective evidence that either Drs. Adkins or Crowder were dissatisfied with Mrs. Orr's job performance prior to the fall of 1975. Before Mrs. Orr came under the supervision of Dr. Adkins, she reported to Dr. Charles Rorie, who was the dean of instruction. He evaluated her on July 26, 1974, for the 1973–74 academic year. His report was essentially favorable and began with this statement: "Mrs. Orr is a hard worker and is committed to the development of a comprehensive community college Learning Resources Center here at West Virginia Northern Community College." The report went on to note that she would be given "increased responsibilities of the supervising and directing of a total Learning Resources Program for our multi-campus system" for the 1974–75 academic year. This granting of increased responsibilities to Mrs. Orr can only be interpreted as a sign that her work performance was good.[11]

Some six months later on January 31, 1975, Dean Rorie made another written evaluation of Mrs. Orr which concluded:

"At this point in time, I am satisfied with your performance and prospects as Chairperson of the Division of Learning Resources. I recommend faculty status, consideration for tenure when eligible under the rules of our evaluation system, and redesignation as Director of the Learning Resources Center, college-district-wide, at WVNCC."

The record discloses that on February 1, 1975, Mrs. Orr was transferred for reporting and evaluating purposes to Dr. Adkins. His first evaluation made on September 8, 1975, while rather cursory, could not be called a negative evaluation.[12]

It was Dr. Adkins' written evaluation of Mrs. Orr dated March 8, 1976, that was deemed to be sufficiently negative to warrant her nonretention. This evaluation begins by reviewing several of her favorable accomplishments.[13] Dr. Adkins subsequently outlines several problem areas, which can be summarized as follows: (1) the submission of invoices directly to the business office rather than to Dr. Adkins' office; (2) the controversy regarding possible faculty status of the personnel in the Learning Resources Center; and (3) the statements referring to the Learning Resources Center as "Learning Laboratories."

---

**11.** It should also be noted that Dean Rorie's evaluation and recommendation of her advancement was for a one-year period and indicated if she could handle the increased responsibilities "she will retain her position and advance in salary and status."

**12.** Dr. Adkins' evaluation stated:

"At the beginning of the academic year, Mrs. Orr reported to Dr. Charles Rorie, Dean of Instruction. After February 1, 1975, Mrs. Orr reported to me. Due to a lack of some written policies, and also due to a change in leadership style with me, Mrs. Orr seemed to experience some anxiety at the outset of the change in Deans. However, Mrs. Orr has worked diligently to communicate her perception of the needs of the Learning Resources Division to me.

"During the year, the library was reclassified according to the Library of Congress model and copies of the Union Catalog are now on each campus.

"Special attention was given both the New Martinsville and Weirton Campuses in anticipation of new facilities. New positions in reader's reference librarian have been filled for the Wheeling and New Martinsville Campuses, respectively."

**13.** This section concluded with these remarks:

"The following general strengths of Mrs. Orr's performance are noted. It appears that she has identified and recruited well-qualified professional personnel to our institution. She worked very hard to develop detailed requests for the equipment needed in the B. & O. Building. She has followed through on Federal Grant applications for the LRC. Mrs. Orr is sincere in her requests for an increasingly larger percentage share of the institutional resources."

It is clear from Mrs. Orr's testimony that her adverse criticism of the proposed plans for the new library facility engendered considerable anger with Drs. Adkins and Crowder. Her basic criticism of the plan was that the library was laid out so that most of the main student traffic in traveling to and from class rooms would pass through the library area. This would have disrupted the library patrons and would have provided little security for the library collection. These objections were pointed out to Dr. Adkins and Mrs. Orr suggested that the plans might be shown to the Learning Resources Committee. He refused this suggestion, stating that the plans were to be kept confidential. She testified that in early October of 1975 she met privately with Dr. Adkins to discuss her concerns over the proposed plans.

On October 10, 1975, at a faculty meeting where Dr. Adkins was not present, other members raised questions about the plans and a committee was appointed consisting of the division chairpersons, including the plaintiff, to discuss the plans with Dr. Crowder. The following day, at an administrative meeting, Mrs. Orr was accosted by Dr. Adkins in an angry fashion about what had occurred at the faculty meeting. Later that same day, Dr. Adkins met with Mrs. Orr and indicated that he would review the plans.

At a subsequent meeting on October 14, 1975, with the division chairpersons, at which Mrs. Orr, Drs. Adkins and Crowder were present, the library plans were discussed. Mrs. Orr testified that she was verbally attacked by Dr. Crowder, who inferred that she had been given ample opportunity for advance input as to the plans.[14]

Although the administration later permitted the Learning Resources Committee to have access to the plans and make recommendations as to changes, which were ultimately adopted, it would appear that from this point on, Drs. Adkins and Crowder adopted a negative position with regard to Mrs. Orr. They limited her claims for retroactive faculty status and, based on the March 26, 1976 evaluation by Dr. Adkins, advised her in April that she would be given a terminal contract.

A number of courts have dealt with the question of whether the plaintiff has shown a sufficient connection between the claimed violation of First Amendment rights and the ultimate discharge. In *Mazaleski v. Treusdell*, 562 F.2d 701, 715 (D.C.Cir.1977), the court characterized this issue:

"This principle has often proved more difficult to apply than to justify, however, because the actual grounds for the dismissal of a government employee may not be readily ascertainable, and almost always are vigorously contested by the litigants. Some test is necessary, then, to diagnose the essential causative factor underlying what is frequently a complex decision, cloaked in subjectivity, for the fact that the government may have considered an employee's protected speech or conduct in reaching an adverse personnel decision does not necessarily render that decision constitutionally infirm."

The court then proceeded to discuss the *Mt. Healthy* test and concluded that "[t]he touchstone for decision, therefore, is the employee's job performance considered in its entirety." 562 F.2d at 715.

In *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th

---

14. Mrs. Orr summarized this meeting in her trial testimony:

"I went to that meeting pretty well prepared to ask questions I might raise about the problems of the building, and I think about the time I started to ask questions, and many others had asked questions, Dr. Crowder rather angrily said to me, 'Jean Orr, I don't know why you are raising all these problems now. You have had plenty of chance for input,' and I said, 'Well, I am sorry, Dr. Crowder, but I have not had any,' and Dr. Adkins at the other

end of the table very angrily said, 'Oh, yes, you have had plenty of input, Jean Orr, but you and Mr. Deibert have been lax in not calling your committee to meet.' I said, 'Dr. Adkins, you told me that my committee must not meet,' and he said, 'Oh, no, Mrs. Orr, you have been very lax and you and Mr. Deibert have been lax in your responsibility in not calling the committee to meet,' and I just gave up. We went on and finished the discussion about the plans of the building."

Cir.1978), the court discussed the following principle of judicial review:

"Circumstantial as well as direct evidence of intent is relevant to a determination of sufficiency. *Williams v. Anderson,* 562 F.2d 1081, 1086 (8th Cir. 1977). A verdict may be directed or a jury verdict overturned 'only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party.' *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970) (emphasis in original)."

In *Zoll,* a teacher had written two letters to the editor of a local newspaper in June and July of 1974. These letters criticized her school principal, the school superintendent and several school board members for a decline in administrative concern with academic excellence. In August of 1974, she was asked to come to her principal's office. He expressed concern over her letters, accused her of misrepresenting the facts and suggested that she had not sent her opinions through proper channels.

In February of 1975, the Board determined that as a result of an enrollment projection for the coming year a reduction in the staff of first grade teachers was warranted. The Board proceeded to follow procedures adopted by the Iowa Department of Public Instruction in determining the pool of teachers from which layoffs were to be made. This included testing procedures to determine who would be laid off. Mrs. Zoll, while scoring the highest on the objective portion of the test, received the lowest score on the subjective evaluation and as a result received the overall lowest score. She was advised of her termination in April of 1975. The court of appeals ruled that there was sufficient circumstantial evidence to support the jury's award.

Without attempting a factual analysis of the various cases upholding jury verdicts on First Amendment claims based on circumstantial evidence, we believe the following cases provide support for finding that the evidence is sufficient to support the jury verdict in this case. *Allaire v. Rogers,* 658 F.2d 1055 (5th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443, *reh. denied,* 457 U.S. 1126, 102 S.Ct. 2949, 73 L.Ed.2d 1343 (1982); *D'Andrea v. Adams,* 626 F.2d 469 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981); *Yoggerst v. Stewart,* 623 F.2d 35 (7th Cir.1980); *McGill v. Board of Education of Pekin Elementary School District,* 602 F.2d 774 (7th Cir.1979); *Bernasconi v. Tempe Elementary School District No. 3,* 548 F.2d 857 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1977); *Allen v. Autauga County Board of Education,* 685 F.2d 1302 (11th Cir.1982).

We have traditionally held that in determining whether the jury verdict is supported by the evidence "every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true." Syllabus Point 3, in part, *Walker v. Monongahela Power Co.,* 147 W.Va. 825, 131 S.E.2d 736 (1963). *See also* Syllabus Point 3, *Royal Furniture Co. v. City of Morgantown,* W.Va., 263 S.E.2d 878 (1980); Syllabus Point 5, *First National Bank of Ronceverte v. Bell,* 158 W.Va. 827, 215 S.E.2d 642 (1975).

Furthermore, we have customarily held as stated in Syllabus Point 4, in part, of *Young v. Ross,* 157 W.Va. 548, 202 S.E.2d 622 (1974), that " '[i]t is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed.' " *See also* Syllabus Point 5, *Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 307 S.E.2d 603 (1983); Syllabus Point 2, *Rhodes v. National Homes Corp.,* 163 W.Va. 669, 263 S.E.2d 84 (1979); Syllabus Point 2, *Skeen v. C and G Corp.,* 155 W.Va. 547, 185 S.E.2d 493 (1971); *Yuncke v. Welker,* 128 W.Va. 299, 36 S.E.2d 410 (1945).

■ Thus, if we combine the foregoing principles, it is clear that in determining whether there is sufficient evidence to sup-

port a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

■ Tested by the foregoing standards, we believe that with regard to the plaintiff's First Amendment claim the jury's verdict should be upheld. The plaintiff's evidence demonstrated that prior to the fall of 1975, she had worked at the College for a period of four years and had been given increased responsibilities by her superiors relative to the Learning Resources Center on the Wheeling campus as well as on the other campuses. She had received no unsatisfactory work evaluations during this period, which included the September 8, 1975 evaluation by Dr. Adkins.

The controversy over the proposed library plans began in early October of 1975. Both Drs. Crowder and Adkins were angered by Mrs. Orr's objections to the plans and expressed their anger to her at faculty meetings. Although the administration receded and revised the proposed plans to meet the recommendations of Mrs. Orr, the Learning Resources Committee and the special faculty committee, it is apparent that Mrs. Orr was deemed by Drs. Adkins and Crowder to have been primarily responsible for the opposition to the proposed plans. Her request for faculty status back to the date of her initial employment was denied. It is not without significance that the first written notification Mrs. Orr received from Dr. Adkins concerning his position on her retroactive faculty status was made in a memorandum dated October 23, 1975, just eight days after Dr. Adkins had verbally attacked Mrs. Orr at a meeting. In the memorandum, Dr. Adkins recom-

mended that the plaintiff be given faculty status as of July 1, 1975.

While the defendants gave retroactive faculty status to two other librarians in December of 1975, they withheld their decision on the plaintiff's status. It was not until the plaintiff inquired in February of 1976 as to her status that she received a decision. This was followed by her first negative performance evaluation made on March 8, 1976, by Dr. Adkins and it was this evaluation which led to her terminal contract in April of 1976. We believe that a jury could properly find that her criticism of the remodeling plans in October of 1975, which the evidence shows clearly angered Drs. Adkins and Crowder, resulted in a series of detrimental moves against her that culminated in her nonretention.[15]

### III. TWO–ISSUE RULE

Although the defendants do not specifically address this issue, the question arises as to whether the general verdict in favor of the plaintiff can stand where one of the two theories of recovery, i.e. the violation of her procedural due process rights, has been found to be insufficient as a matter of law.

There is a split of authority on this point as evidenced by this statement from 76 Am.Jur.2d *Trials* § 1149 at 120 (1975):

"According to some authorities, where several counts are set out in a declaration and there is evidence to support one of the counts, a general verdict will be sustained, although the plaintiff fails to prove the other counts. According to other authorities, a general verdict cannot be sustained in the absence of evidence to support one of the causes of action declared upon, at least where it is impossible to tell on which cause of action the damages were allowed." (Footnotes omitted)

This point of law is sometimes referred to as the two-issue rule. *E.g., Colonial*

---

**15.** The fact that her criticism of the remodeling plans resulted in changes favorable to her position cannot be taken as a defense to her First Amendment claim. To accept such a position would virtually emasculate free speech protec-

tion as the employer could accede to the criticism then later fire the employee. The teaching of *Pickering* and *Mt. Healthy* is that a public employee's employment rights are protected when free speech is properly exercised.

*Stores, Inc. v. Scarbrough,* 355 So.2d 1181 (Fla.1978); *Anderson v. West,* 270 S.C. 184, 241 S.E.2d 551 (1978); 5 Am.Jur.2d *Appeal and Error* § 787 (1962). Although there is a split of authority, we believe that a majority of courts which have recently considered the issue have concluded that where a jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed. *E.g., Adkins v. Ford Motor Co.,* 446 F.2d 1105 (6th Cir.1971) (Applying Tennessee law); *Automotive Acceptance Corp. v. Powell,* 45 Ala.App. 596, 234 So.2d 593 (1970); *Reese v. Cradit,* 12 Ariz.App. 233, 469 P.2d 467 (1970); *Codekas v. Dyna-Lift Co.,* 48 Cal. App.3d 20, 121 Cal.Rptr. 121 (1975); *Filisko v. Bridgeport Hydraulic Co.,* 176 Conn. 33, 404 A.2d 889 (1978); *Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181 (Fla. 1978); *Moore v. Jewel Tea Co.,* 46 Ill.2d 288, 263 N.E.2d 103 (1970); *Knisely v. Community Traction Co.,* 125 Ohio St. 131, 180 N.E. 654 (1932); *Anderson v. West,* 270 S.C. 184, 241 S.E.2d 551 (1978); *Alex v. Armstrong,* 215 Tenn. 276, 385 S.W.2d 110 (1964); *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982). *Contra, Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978); *Gonyea v. Duluth, Missabe & Iron Range Ry. Co.,* 220 Minn. 225, 19 N.W.2d 384 (1945); *Martin v. Northern Pac. Ry. Co.,* 51 Mont. 31, 149 P. 89 (1915); *Heinen v. Heinen,* 64 Nev. 527, 186 P.2d 770 (1947); *Maccia v. Tynes,* 39 N.J.Super. 1, 120 A.2d 263 (1956); *Hamilton v. Presbyterian Hospital of the City of New York,* 25 A.D.2d 431, 267 N.Y.S.2d 656 (1966); *Wentz v. Deseth,* 221 N.W.2d 101 (N.D.1974); *Bredouw v. Jones,* 431 P.2d 413 (Okl.1967); *Norfolk & W. Ry. Co. v. Mace,* 151 Va. 458, 145 S.E. 362 (1928). Although most courts do not give any extended discussion of the policy behind the rule, in *Knisely v. Community Traction Co.,* 125 Ohio St. at 133, 180 N.E. at 654, this statement was made:

> "The [two-issue] rule ... is a rule of policy.... The soundness or unsoundness of the rule cannot be argued upon principle because no principle is involved. It is purely and solely a question as to

whether the trial court will be held to a strict accountability to submit each and every issue in a case free from error, or whether, on the other hand, if one issue complete in itself as a cause of action or defense is submitted free from error, and there is nothing to indicate upon which issue a general verdict is grounded, other issues may be disregarded. The rule was designed to simplify the work of trial courts and to limit the range of error [in] proceedings."

Additionally, we fail to see the logic of a rule that requires a general verdict supported by one good theory of liability to be set aside. We are aware of no presumption that requires a court to assume that the jury has returned the verdict on the cause of action that was not supported by sufficient evidence. It must be remembered that in a civil case the burden of proof in order to prevail is only by a preponderance of the evidence.

Finally, we believe that any supposed unfairness to the defendants arising from the adoption of the rule that permits the general verdict to be upheld if there is one valid cause of action to support it is cured by an additional corollary: that a defendant may submit a special interrogatory or verdict to require the jury to state its finding as to each theory. *E.g., Codekas v. Dyna-Lift Co.,* 48 Cal.App.3d 20, 121 Cal. Rptr. 121 (1975); *Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181 (Fla.1978).

In the present case, while the defendants requested a number of special interrogatories, they did not seek a finding that would have required the jury to state its verdict separately as to each of the two counts.

We believe that our adoption of the rule permitting a general verdict to be sustained if it is supported by one good theory of liability is not inconsistent with our prior law. We have not had occasion to discuss this question in any detail, although in Syllabus Point 6 of *Miller v. White,* 46 W.Va. 67, 33 S.E. 332 (1899), we said:

> "Where two matters are submitted to a jury, one of them improperly submitted, and evidence is given pertinent alone to that improperly submitted, such

improper submission to the jury, and the evidence thereon, will not affect the verdict on the matter properly before the jury, where the matters are distinct, and it appears that such improper submission and evidence did not confuse the jury, or operate to the prejudice of the party upon the issue properly before the jury."

In a related area, which evolved from our procedural law prior to the adoption of the Rules of Civil Procedure, we have held that where a declaration contained several counts or causes of action and one count was bad as a matter of law, a general verdict sustained by a good count would be upheld. *E.g.,* Syllabus Point 4, *Gilkerson v. Baltimore & Ohio Railroad Co.,* 129 W.Va. 649, 41 S.E.2d 188 (1946); Syllabus Point 1, *Freeman v. Monongahela Valley Traction Co.,* 98 W.Va. 311, 128 S.E. 129 (1924).[16] These cases referred to a procedural statute, W.Va.Code, 56–6–26,[17] which the Court in *Freeman* recognized as changing the common law rule. We see no reason to ignore the evolution of our own procedural law nor Syllabus Point 6 of *Miller,* particularly in light of the rule in other jurisdictions that is compatible with our law.

■ Consequently, we hold that where a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by the evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues.

■ In setting this rule, we do not mean to imply that a trial judge is required to submit special interrogatories or verdicts to the jury in every case that involves multiple causes of action. *See* Syllabus Point 15, *Carper v. Kanawha Banking & Trust Co.,* 157 W.Va. 477, 207 S.E.2d 897 (1974). If the judge believes there is sufficient evidence to support jury consideration of the various causes of action, then he is free to refuse special interrogatories or verdicts.

■ It is only when the trial judge is specifically requested by the defendant to submit special findings and refuses to do so, and on appeal we conclude that one of the causes of action given to the jury is insufficient as a matter of law, that a reversal will occur. Here no such special finding was requested.

## IV.  OTHER ASSIGNED ERRORS

The remaining assignments of error asserted covering a variety of points may be disposed of without extensive discussion. The defendants argue that their defense of good faith immunity with regard to the procedural due process claim was established as a matter of law. We have held that the procedural due process claim should have been dismissed as a matter of law and, therefore, it is unnecessary for us to consider this issue. The same reasoning applies to alleged errors in the instructions relevant to the procedural due process claim.

16.  Syllabus Point 1 of *Freeman* states:

"In an action for wrongful injury, if one of the other two counts in the declaration be good, the other bad, even though there be a demurrer to the declaration and to each count thereof, and said demurrer is improperly overruled by the trial court, a general verdict giving entire damages will be good, and does not constitute grounds for reversal by this court."

17.  W.Va.Code, 56–6–26, provides:

"When there are several counts in a declaration, one or more of which are faulty, the defendant may demur to the faulty count or counts, or move the court to instruct the jury to disregard them. If he does neither, and

entire damages be found, judgment shall be entered against the defendant for the damages found, if any count be good, although others be faulty, unless the court can plainly see that the verdict could not have been found on the good count. If he demurs to the faulty count, or moves the court to instruct the jury to disregard it, and his demurrer or motion is overruled, and entire damages be found, and it cannot be seen on which count the verdict was founded, if the jury has been discharged the verdict shall be set aside, but if it is manifest that the verdict could not have been found on the bad count, the verdict shall be allowed to stand. If the jury has not been discharged, the court shall send it back with instructions to designate on which count of the declaration its verdict is found."

■ The defendants contend that Mrs. Orr failed as a matter of law to mitigate her damages by seeking other employment after she had been given notice of the 1976–77 terminal contract. Specifically, the defendants point to Mrs. Orr's failure to apply for any jobs during the 1976–77 school term when she was under her terminal contract, her refusal to accept job offers and her staying in England for four months with her husband, who was on a sabbatical. The burden of proving mitigation of damages in a wrongful discharge case was discussed in Syllabus Point 2 of *Mason County Board of Education v. State Superintendent of Schools,* 170 W.Va. 632, 295 S.E.2d 719 (1982):

> "Unless a wrongful discharge is malicious, the wrongfully discharged employee has a duty to mitigate damages by accepting similar employment to that contemplated by his or her contract if it is available in the local area, and the actual wages received, or the wages the employee could have received at comparable employment where it is locally available, will be deducted from any back pay award; however, the burden of raising the issue of mitigation is on the employer."

■ The record discloses that Mrs. Orr did not make any job applications during the year of her terminal contract because she believed that she would eventually be reinstated to her position. We fail to see how Mrs. Orr can be accused of failing to fulfill her duty to mitigate damages by not applying for other jobs at a time in which she was still employed. There is no evidence in the record that Mrs. Orr turned down any jobs offered to her. She testified that she was made aware of two possible jobs to which she could have applied. One was at a considerably reduced pay level and the other was only a temporary job and was located some forty miles from her home.

In *Mason County,* we quoted at some length from C. McCormick, Damages §§ 159, 160 (1935), including this statement with regard to a plaintiff's duty to take inferior jobs or work out of his locality:

"'[T]he plaintiff will only be charged with what he could have earned in another position of the same grade, in the same line of work, and in the same locality.'" 170 W.Va. at 636, 295 S.E.2d at 723–24. Under this rule, Mrs. Orr was not required to seek either job.

During the time that she was actually unemployed, Mrs. Orr testified that she had a considerable number of job interviews, but failed to be hired for another position until January, 1978. As for her brief stay in England, Mrs. Orr explained that if she had been able to acquire a work permit, she might have been able to be hired for a librarian position, but she would only have worked for a month or two. Under these circumstances, we conclude that the evidence does not support the defendants' claim that Mrs. Orr failed to mitigate her damages.

■ A further mitigation of damages point is raised. The defendants assert that the unemployment benefits received by the plaintiff should have been deducted from the final award of damages. In *Ratlief v. Yokum,* 167 W.Va. 779, 280 S.E.2d 584, 589–90 (1981), we discussed the collateral source rule at some length and concluded in Syllabus Point 7:

> "The collateral source rule normally operates to preclude the offsetting of payments made by health and accident insurance companies or other collateral sources as against the damages claimed by the injured party."

We held in *Jones v. Laird Foundation, Inc.,* 156 W.Va. 479, 195 S.E.2d 821 (1973), that the collateral source rule applies to workmen's compensation benefits and cannot be used to reduce damages. *See also Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 307 S.E.2d 603 (1983); *Ellard v. Harvey,* 159 W.Va. 871, 231 S.E.2d 339 (1976). We conclude that the trial court did not commit error in holding that unemployment benefits may not be used to reduce an award of damages under the collateral source rule. *See generally* 22 Am.Jur.2d *Damages* § 209 (1965); Annot., 4 A.L.R.3d 535 (1965).

The defendants maintain that the trial court erred in failing to grant a mistrial based upon the introduction of what is

termed inflammatory evidence. Mrs. Orr testified that at work one day she discovered some newspaper clippings placed on her desk by some unknown person that concerned cases Mrs. Orr's attorney had lost. Dr. Adkins had previously denied placing any newspaper clippings on Mrs. Orr's desk. After Mrs. Orr had completed her testimony on this point, the defendants moved to strike any reference to the newspaper clippings. The trial judge agreed that it was improper evidence and instructed the jury that it should disregard the references to the clippings. Subsequently, the defendants moved for a mistrial, claiming that the damage could not be undone, but this motion was denied by the trial judge.

We disagree that the reference to the newspaper clippings can be characterized as inflammatory. We believe that the trial court acted properly in cautioning the jury and denying the motion for mistrial. We stated in Syllabus Point 5 of *State v. Gwinn*, 169 W.Va. 456, 288 S.E.2d 533 (1982), *quoting* Syllabus Point 7, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (1975), *overruled on other grounds, State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980), and Syllabus Point 18, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966):

" 'Ordinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error.' "

We noted in *Gwinn* that there are extraordinary situations where the introduction of evidence is so prejudicial that an instruction to disregard such evidence will be insufficient and a mistrial should be granted. *See, e.g., Cannellas v. McKenzie*, 160 W.Va. 431, 236 S.E.2d 327 (1977); F. Cleckley, Handbook on Evidence for West Virginia Lawyers 38 (Supp.1979). We do not find that the reference to the newspaper clippings rises to this high a level of prejudice. We, therefore, find no merit in the defendants' argument on this point.

Next it is alleged that the trial court erred in refusing to allow the defense counsel to ask leading questions in cross-examining the defendants, who had previously been called to the stand by the plaintiff as adverse party witnesses, pursuant to Rule 43(b) of the West Virginia Rules of Civil Procedure. The claim is made that the defense counsel's attempts to rehabilitate the defendants' testimony was hampered by the inability to ask leading questions. We have reviewed the trial transcript and do not find any instance where the defense counsel was unable to get relevant evidence in through the examination of his clients after the plaintiff's counsel completed his examination under Rule 43(b). Moreover, defense counsel does not in his brief point to any such evidence. We, therefore, decline to address this issue.

The Board of Regents asserts that an award of attorney's fees pursuant to 42 U.S.C. § 1988 cannot be sustained in an action filed in a state court for violation of constitutional rights and therefore the court erred in awarding such fees. The United States Supreme Court was presented with this issue in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and concluded that the awarding of attorney's fees under 42 U.S.C. § 1988 is appropriate in either federal or state courts. *See also Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). We therefore find no merit in this assignment of error. *Cf.* Syllabus Point 4, *Mason County Board of Education v. State Superintendent of Schools*, 170 W.Va. 632, 295 S.E.2d 719 (1982).

Several errors are alleged regarding either the giving of plaintiff's or refusing to give defendants' instructions. The defendants assert error was committed in the trial court's refusal to give Defendants' Instruction No. 10, which stated that any damages awarded would have to be paid by the defendants personally and not by the State of West Virginia. We have examined all of the instructions and find that there were no instructions that indicated that the State of West Virginia would be liable for the damages. The instructions given to the jury spoke of awarding damages against Drs. Crowder and Adkins

and the verdict form was couched against each defendant. There was nothing to suggest to the jury that there was anything but personal liability. We, therefore, believe the court correctly refused Defendants' Instruction No. 10.

■ Two of plaintiff's instructions challenged by the defendants relate to the plaintiff's burden of establishing the First Amendment claim. Plaintiff's Instructions Nos. 3 and 13 were correct statements of the law and were thus properly given. Defendants' Instruction No. 19, which was refused, essentially restated an argument taken from *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 575, 50 L.Ed.2d at 483, where Justice Rehnquist commented:

"A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."

This was not a legal statement but an argument in support of the *Mt. Healthy* rule that a plaintiff's constitutional claim could be defeated if the defendant could show that the decision to fire the plaintiff rested on another adequate basis such as incompetency. We stated in *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316, 325 (1983), that an instruction which incorporates language from an opinion which is argumentative need not be given as it may mislead the jury. We find no error in the rejection of this instruction.

■ The remaining claims of instructional errors relate to damages. Defendants' Instruction No. 7A which was refused stated that the plaintiff could not recover damages for mental anguish unless she suffered some physical injury. Defendants cite *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978). However, as we pointed out in the subsequent appeal, *Harless v. First*

*National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982), in Syllabus Point 3: "The tort of retaliatory discharge carries with it a sufficient indicia of intent, thus, damages for emotional distress may be recovered as a part of the compensatory damages."

It appears that in a section 1983 action, the United States Supreme Court has fashioned a federal common law of damages which is apparently designed to make the damage remedies uniform and not necessarily dependent upon the law of the state where the cause of action arose. *E.g.*, *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Note, *Damage Awards for Constitutional Torts: A Reconsideration After* Carey v. Piphus, 93 Harv.L.Rev. 966 (1980); Note, *Section 1983: An Analysis of Damage Awards*, 58 Neb.L.Rev. 580 (1979). *See* 42 U.S.C. § 1988.

In *Carey*, the United States Supreme Court recognized in a section 1983 action involving a violation of procedural due process rights that a claim for mental distress would be allowed if proven:

"In sum, then, although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused." 435 U.S. at 264, 98 S.Ct. at 1052, 55 L.Ed.2d at 265.

Other courts have applied the same principle to section 1983 suits involving First Amendment claims. *E.g.*, *Stern v. Shouldice*, 706 F.2d 742 (6th Cir.1983); *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir.1983).

In the present case, the plaintiff did produce psychiatric as well as lay testimony that she suffered mental and emotional distress as a result of her termination. We,

therefore, conclude that the trial court committed no error in refusing this instruction. Nor do we find any reversible error as to the plaintiff's damage instructions.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.

McHUGH, J., deeming himself disqualified, did not participate in the consideration or decision of this case.

NEELY, Justice, dissenting:

I cannot agree that a generally unsatisfactory public employee immunizes herself from dismissal by opening her mouth and uttering sound. I would agree that the First Amendment is a vital democratic protection; but allowing that constitutional protection to be used as a shield from firing by an employee who is disgruntled, disagreeable and inefficient, but not mute, trivializes the concept of free speech.

Mrs. Orr claims that she was not granted tenure because of her criticism of the plans for remodeling of the college's Learning Resources Center. Those comments were made at a faculty meeting which Mrs. Orr was attending because of her employee status. In upholding Mrs. Orr's claim, the majority opinion relies heavily on *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Supreme Court's most recent pronouncement on First Amendment rights of public employees emphasized, however, *Pickering* repeatedly talked about the rights of a public employee "as a citizen, in commenting upon matters of public concern." *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983). That emphasis reflected the Court's awareness that "government offices could not function if every employment decision became a constitutional matter." *Id.*

In the case before us, Mrs. Orr was not speaking as a citizen. She was acting in her capacity as a librarian. Although the allocation of library space at a public institution is arguably a matter of tangential public concern, Mrs. Orr's comments were not motivated by her sense of duty as a citizen. Her concerns were those of an employee who disagreed with her superiors' decisions on a matter of internal policy. Her claim is that her superiors were angered by her decision not to discuss her criticisms with them before going to the entire faculty with a departmental gripe. Their displeasure at that approach does not seem unwarranted. If we extend First Amendment protection to all such situations, this Court may well succeed in doing the impossible: We will make government operate even less efficiently than it does today.

The law may sometimes move in mysterious and burdensome ways, but it is not so mysterious and burdensome as all that. In *Chitwood v. Feaster*, 468 F.2d 359 (4th Cir.1972), another case dealing with untenured teachers in West Virginia, the Fourth Circuit set out the limited scope of First Amendment protection:

Some of the affidavits refer to what seems to be bickering and running disputes with the department heads. We do not intend to suggest that that kind of speech is protected by the First Amendment in the sense that it may not be considered in connection with the termination of the employment relationship. [An employer] has a right to expect [an employee] to follow instructions and to work cooperatively and harmoniously with the head of the department. If one cannot or does not, if one undertakes to seize the authority and prerogatives of the department head, he does not immunize himself against loss of his position simply because his noncooperation and aggressive conduct are verbalized.

*Id.* at 360–61. That language was quoted with approval in the recent case of *English v. Powell*, 592 F.2d 727 (4th Cir.1979). In that case, the court determined that an employee of the North Carolina County Alcoholic Beverage Control Board had ignored the chain of command because he was opposed to his immediate superior. The court opined that dismissal would have been justified despite the employee's reliance on the First Amendment. As the

opinion succinctly stated, "[T]here are limits to *Pickering*." *Id.* at 732.

Furthermore, I do not believe that Mrs. Orr has made out a case that her comments were a substantial factor in the decision to terminate her employment. It should first be noted that the majority's approach to this case places an extraordinarily difficult evidentiary burden on public employers. They are asked to prove a negative. If an employee has ever said anything remotely controversial on a topic that is conceivably of public interest, the employer must prove that the comment was not a factor leading to the dismissal.

Despite the apparent unreasonableness of this standard, the school officials in this case can establish a strong record. As a first cut, it is certainly worth noting that Mrs. Orr's criticisms of the original plan for the Learning Center were eventually accepted in full. Despite her superiors' understandable annoyance at her decision to voice her comments at a general faculty meeting without first sharing them with her co-workers, they ultimately accepted her suggestions as meritorious. This broadmindedness certainly tends to negate the inference that those comments were a material factor in her dismissal.

In addition, however, the Board is hardly at a loss to demonstrate other reasons for choosing not to give Mrs. Orr tenure. Mrs. Orr had received a negative review from an impartial consultant, had neglected her responsibility to maintain the branch libraries, had ignored the chain of responsibility in handling the library system's purchases, and had been found generally disagreeable both by those who worked for her and by those to whom she reported. We can speculate that if Mrs. Orr had waxed eloquent on the visionary nature of the original plan for the Learning Resources Center her employers may have overlooked her other inadequacies: such speculation, however, does not amount to evidence. Tis a brave new world indeed where an employee's only means of obtaining absolute job security is to proclaim that his boss is stupid!

There is nothing in the record that suggests Mrs. Orr had a right to tenure. As the Supreme Court ruled in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), untenured teachers do not have any reasonable expectancy of permanent employment. More specifically, the Fourth Circuit has held that under West Virginia tenure regulations: "[T]enure is not granted automatically, but requires positive and affirmative action" and that an untenured employee "had no property right in or legal expectancy of further employment." *Sheppard v. West Virginia Board of Regents*, 516 F.2d 826, 829, (4th Cir.1975).

I would also submit that there is nothing in the record that supports a charge that her dismissal was unfair. However, it is not the place of this Court to attempt to right all wrongs—even if we entertain some lurking suspicion that Mrs. Orr's dismissal was for other than the noblest of reasons. Once again, I cannot improve on the language of the Supreme Court in outlining the limited scope of our inquiry: "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for dismissal are alleged to be mistaken or unreasonable." *Connick, supra,* at 1690.

Mrs. Orr's record prior to her statement about the Learning Resources Center was far from exemplary. Her statements about the Center were made for personal reasons and not to advance public discourse. They were made in blatant disregard of the normal and reasonable business practice of discussing one's disagreements with one's bosses before going over their heads. Nevertheless, her suggestions were ultimately followed. To allow her to claim that those statements are at the heart of First Amendment protection is contrary to the current state of the law. To allow her to assert that those statements were a substantial cause of her dismissal is simply an unreasonable reading of the facts of this case. Bad workers do not

become better simply because they talk.  I dissent.